# EXHIBIT 5

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2              WESTERN DISTRICT OF MICHIGAN

 3    _____

 4   YVONNE JAKUBOWSKI,

 5              Plaintiff,              Case No. 1:11-cv-597

 6   vs.                               Hon. Robert Holmes Bell

 7   MOSAIC MERCANTILE, INC., a Montana

 8   corporation, and HOBBY LOBBY

 9   STORES, INC., an Oklahoma

10   corporation, TRIANGLE COATINGS,

11   INC., a California corporation, and

12   MICHAEL YABLON, individually,

13              Defendants.

14    _____

15

16   DEPONENT:  DENNIS JAKUBOWSKI

17   DATE:      Friday, January 20, 2012

18   TIME:      1:45 p.m.

19   LOCATION:  3996 Chicago Drive, S.W.

20              Grandville, Michigan

21   REPORTER:  Kathryn Trap Hevelhurst, RPR, CSR-1457

22

23

24

25
```

**Kane & Trap Court Reporting, Inc.**
services@kaneandtrap.com
**(616) 742-0700**

Page 2

```
 1   APPEARANCES:

 2

 3   BOLHOUSE, BAAR & LEFERE, PC

 4   BY:   Michelle McLean

 5         3996 Chicago Drive, S.W.

 6         Grandville State Bank Building

 7         Grandville, MI   49418

 8         (616) 531-7711

 9            On behalf of Plaintiff

10

11   HARVEY, KRUSE

12   BY:   Gary L. Stec

13         60 Monroe Center

14         Suite 500B

15         Grand Rapids, MI   49503

16         (616) 752-0050

17            On behalf of Defendant Hobby Lobby

18

19   FORMAN PERRY WATKINS KRUTZ & TARDY, LLP

20   BY:   Cleo N. Fekaris

21         17199 North Laurel Park Drive

22         Suite 314

23         Livonia, MI   48152

24         (734) 591-0454

25            On behalf of Defendants Mosaic & Michael Yablon
```

Page 3

1                         I N D E X

2     WITNESS:                                    PAGE

3     DENNIS JAKUBOWSKI

4     Examination by Mr. Stec                       4

5     Examination by Ms. Fekaris                   49

6     Examination by Ms. McLean                    54

7     Re-Examination by Mr. Stec                   63

8     Re-Examination by Ms. Fekaris                66

9     Re-Examination by Ms. McLean                 68

10    Re-Examination by Mr. Stec                   71

11    Re-Examination by Ms. Fekaris                74

12    Re-Examination by Ms. McLean                 75

13

14    EXHIBITS:

15    None offered.

16

17

18

19

20

21

22

23

24

25

**Kane & Trap Court Reporting, Inc.**
services@kaneandtrap.com                 **(616) 742-0700**

Page 4

```
 1              Grandville, Michigan
 2      Friday, January 20, 2012 - 1:45 p.m.
 3                  * * *
 4          DENNIS JAKUBOWSKI,
 5  having been first duly sworn to tell the truth, the whole
 6  truth, and nothing but the truth, was examined and testified
 7  as follows:
 8          E X A M I N A T I O N
 9  BY MR. STEC:
10  Q   Mr. Jakubowski, we were introduced this morning when we first
11      arrived. I'm the attorney for Hobby Lobby. You understand
12      that?
13  A   Yes.
14  Q   I'm going to ask you several questions today about yourself
15      and about your involvement in the things that have been
16      alleged in your wife's Summons and Complaint. Do you
17      understand that?
18  A   Yes.
19  Q   Have you ever given a deposition like this before?
20  A   No.
21  Q   Have you ever been involved in any type of lawsuit before,
22      other than perhaps marital divorces?
23  A   No.   -
24  Q   I understand you're retired?
25  A   Yes.
```

Page 5

```
 1  Q   From General Motors?
 2  A   Correct.
 3  Q   Were you a member of the union during the time you were
 4      there?
 5  A   Yes.
 6  Q   Did you ever hold office for the union?
 7  A   No.
 8  Q   What union were you a member of?
 9  A   2151.
10  Q   What's your date of birth?
11  A   September 26, 1953.
12  Q   Where did you go to school?
13  A   High school? I went to West Catholic.
14  Q   Any college?
15  A   I went to a trade school. Electronics. It was called UEI.
16  Q   He may have been a little younger than you, but do you know
17      Al Szysowski?
18  A   Where?
19  Q   West Catholic?
20  A   I graduated in '71.
21  Q   He would have been '73 or '74.
22  A   Doesn't sound familiar.
23  Q   At your wife's deposition -- and, by the way, just to kind of
24      put some things into perspective, let me give you some ground
25      rules.
```

Page 6

```
 1  I'm going to ask you these questions verbally; you
 2  need to respond verbally. You're doing a good job so far.
 3  Just keep that up, because we have a court reporter that's
 4  taking down everything that I say, that you say, and what
 5  anyone else might say, so you can't nod your head or shake
 6  your head because that doesn't work out. If you do that,
 7  I'll say is that a yes or a no. That's why I'm doing that,
 8  because later on when this gets transcribed, nobody wants to
 9  be confused about what the answer was; okay?
10  A   Yes.
11  Q   Similarly, if you use slang instead of plain English, if you
12      say uh-huh, I'm going to ask you is that a yes; all right?
13      It's not to embarrass you, but, again, I just want to make
14      sure we're clear.
15  A   Okay.
16  Q   If you don't understand what I'm saying, I want you to tell
17      me that, and I'll repeat my question or rephrase it, because
18      I don't want to confuse you. I'm not here to trick you. I
19      just want to get information; okay?
20  A   Yes.
21  Q   So just tell me if you're confused, and I'll repeat it or
22      rephrase it to make sure that you do understand it and that
23      will work a lot better; okay?
24  A   Yes.
25  Q   I might tell you to just answer my question, because we've
```

Page 7

```
 1  been here a long time already, we've gotten a lot of
 2  information out of your wife. She was in here for almost
 3  three hours for a reason, so we got a lot of information from
 4  her. I'm going to ask you some of the same kinds of things I
 5  asked her, but if you just answer my question, we'll get
 6  through it a lot quicker than if you want to give me a
 7  chapter of a story; understand?
 8  A   Yes.
 9  Q   It's not that I'm disinterested in what you have to say, but
10      I just want to ask some very specific things; okay?
11  A   Sure.
12  Q   All right. Let me confirm a few things.
13      When your wife went to my client's store, Hobby
14      Lobby, you didn't go with her when she bought what we've
15      marked as Exhibit 2, did you?
16  A   No.
17  Q   Do you ever shop at Hobby Lobby?
18  A   Yes.
19  Q   What do you get when you go there?
20  A   Probably frames and stuff for pictures.
21  Q   Don't know anybody that works there, do you?
22  A   No.
23  Q   Did you have any discussions with anybody there about this
24      product that I've marked as Exhibit 2?
25  A   No.
```

4 (Pages 4 to 7)

**Page 8**

1 Q   I've gotten recordings of the conversations that you made
2   with Mr. Yablon and the other people that you've talked to
3   after this accident. Is it fair to say that you have not had
4   any communications with my client or any representative of my
5   client with respect to this lawsuit or the issues involved?
6 A   Could you clarify that again?
7 Q   Have you talked to anybody from Hobby Lobby about this
8   lawsuit or anything involved in it?
9 A   Oh, no.
10 Q   I understand you went back to Hobby Lobby at some point after
11   your wife used the product that we've marked as Exhibit 2 and
12   you would have bought what we've marked as Exhibits 3 and 4.
13   Did you do that?
14 A   Yes.
15 Q   Do you know when you went back to Hobby Lobby to get these
16   products?
17 A   I got the sealer on the -- I'm not exactly sure, but I think
18   it was June 17 or so, a couple days after -- a couple days
19   after Yvonne bought hers on the 11th.
20 Q   And then you went back a second time to get the sealer or the
21   primer?
22 A   They did not sell the primer. I guess I misspoke. I bought
23   the sealer.
24 Q   Exhibit 3?
25 A   Exhibit 3. I'm mistaken on that one.

**Page 9**

1 Q   On the 17th you believe?
2 A   Yes.
3 Q   Did you buy Exhibit 4 there?
4 A   No, I did not.
5 Q   Where did you get Exhibit 4?
6 A   I got that -- I had to order that.
7 Q   Who did you order it from?
8 A   Went online and it was one of the craft online stores.
9 Q   When you went back on June 17, 2008, to purchase what we've
10   marked as Exhibit 3, you knew exactly what you were going
11   there to buy?
12 A   Yes.
13 Q   Didn't talk to anybody there about what you were going to
14   buy?
15 A   No.
16 Q   Found it in the aisle on a shelf, took it, and went up to the
17   cashier, paid for it, and left basically?
18 A   Yes.
19 Q   May have said hello to the cashier, but beyond that, there
20   wasn't any discussion about the product or anything about the
21   product, was there?
22 A   I think that's correct.
23 Q   We marked as Exhibit 1 at your wife's deposition some e-mails
24   that were produced in this case, and you appear to be the
25   author of some of those. These are communications between

**Page 10**

1   you and Mr. Yablon. Have you seen those?
2 A   Yes, I have.
3 Q   Are these all of the communications that took place by way of
4   the internet e-mails between you and Mr. Yablon?
5 A   Yes.
6 Q   Similarly, with the recordings, did you record any other
7   conversations with anyone other than the ones that have been
8   produced to your wife's counsel in this case?
9 A   No, I have not.
10 Q   Did you have any communications with Mr. Yablon other than
11   the ones that you recorded?
12 A   The only time was either through the e-mail or through the
13   telephone conversations.
14 Q   Every time you talked to him on the phone you recorded those
15   conversations?
16 A   The times he called, yes.
17 Q   Similarly, there was -- I think the first call may have gone
18   to a customer service representative at Mosaic Mercantile,
19   and you recorded that conversation as well?
20 A   Yes. I think I have, yes.
21 Q   In other words -- and I thought I asked this, but let me make
22   sure that I'm clear -- the only conversations -- verbal
23   conversations that you had with any representatives of Mosaic
24   Mercantile were recorded by you?
25 A   Yes.

**Page 11**

1 Q   Have you had any telephone conversations with anyone from
2   Triangle Coatings?
3 A   No.
4 Q   Have you tried to contact someone there about this product?
5 A   I have not.
6 Q   Do you know their involvement, if any, in this matter?
7 A   I did not know at that time.
8 Q   Well, do you know now?
9 A   Yes, I do.
10 Q   What's your understanding now?
11 A   Apparently they manufacture it, I think.
12 Q   Your understanding is that they make what's in these bottles
13   and sell it to Mosaic Mercantile who puts it in these
14   containers?
15 A   That is correct, I think.
16 Q   That's your understanding?
17 A   Yes.
18 Q   Your wife answered a lot of questions this morning about her
19   table project that she bought Exhibit 2 to use on and told us
20   that on the day of this incident when she was applying the
21   product in Exhibit 2 that she was basically working on that
22   project by herself. You weren't participating in it; is that
23   fair?
24 A   That's correct.
25 Q   This was her deal, not yours?

5 (Pages 8 to 11)

**Kane & Trap Court Reporting, Inc.**
services@kaneandtrap.com
(616) 742-0700

Page 12

1 A   Absolutely.

2 Q   You don't look like the craft guy to make tile tables, but

3   you never know.

4 A   Not at the time.

5 Q   At some point when she -- by the way, did you have any

6   communications or discussions with her before she was going

7   to use what was in Exhibit 2 that day?

8 A   Any discussion in did I talk to her about -- could you

9   explain that a little bit more?

10 Q   When she went to my client and bought Exhibit 2, she didn't

11   come home and say, Honey, look what I bought, any idea how

12   I'm supposed to apply this?  She basically -- from listening

13   to her, she just looked at it, read the label, and figured

14   out how to apply it and applied it without any involvement

15   from you?

16 A   Pretty much I think that's how it went.

17 Q   It sounds like your first involvement would have been when

18   she was done applying it and went to wipe off the residue

19   that may have been on the ceramic tile surface and not on the

20   grout.  She told us she tried to do that using water, wasn't

21   having much success, came to you and said, I can't get the

22   residue off the tile, and asked you what she should do, and

23   you told her to go use some mineral spirits.  Is that

24   accurate?

25 A   I think it is.

Page 13

1 Q   These were mineral spirits that you had somewhere in your

2   house, I presume?

3 A   Yes.

4 Q   What had you used them on previously?

5 A   Quite a few different home projects.

6 Q   Your wife told me you do all the painting around the house?

7 A   I do most of the painting, yes.

8 Q   So if you ever had occasion to use oil-based paint, you would

9   use mineral spirits or paint thinner to clean up your

10   brushes, I presume?

11 A   Yes.

12 Q   Is that one of the things you would use it on?

13 A   Yes, it would be.

14 Q   Did you ever strip paint off wood, things like that?

15 A   Yes.

16 Q   Did you ever use mineral spirits for anything related to that

17   type of a project?

18 A   We did some steps going upstairs into our living room.

19 Q   Was this after this incident or before?

20 A   This was after.

21 Q   Okay.  How about before this incident that we're going to

22   talk about that brought about this lawsuit.  I'm trying to

23   find out from you what you would have had occasion to use the

24   mineral spirits on.

25 A   I can't recall exactly, but we were in the mode of remodeling

Page 14

1   our house so there's been numerous repairs and work that

2   we've been doing.

3 Q   Your wife told us that she never used mineral spirits before

4   the day of this use?

5 A   Okay.

6 Q   Do you have a recollection of her ever using mineral spirits

7   on anything before the day that she used them on this tile

8   table?

9 A   Myself?

10 Q   Do you know if she ever used mineral spirits before that?

11 A   I cannot recall.

12 Q   By the way, do you still have the container that the mineral

13   spirits were in that day?

14 A   I'm not sure.

15 Q   Were the mineral spirits in a one-gallon rectangular metal or

16   tin container or a white plastic container?  What do you

17   remember about the appearance of the container?

18 A   It was most likely a quart container, I think.

19 Q   Quart, okay.  Did you give her any instruction or direction

20   on how to use the mineral spirits that day?

21 A   I didn't think it was necessary, no.

22 Q   When you bought Exhibits 3 and 4 -- they've been open

23   previous to today obviously; true?

24 A   Uh-huh.

25 Q   Yes?

Page 15

1 A   Yes.

2 Q   When you bought them and took the top off for the first time,

3   was there a foil seal on the inside underneath the top?

4 A   I cannot recall that.

5 Q   Your wife told me that during the time that she was using the

6   mineral spirits to try to get the residue off the tile that

7   you were not present; is that a fair statement, an accurate

8   statement?

9 A   I was at the house and she was doing the project outside.

10 Q   But you were not outside with her while she was doing it?

11 A   I was doing --

12 Q   Other things?

13 A   -- other things, yes.

14 Q   So in terms of the amount of time that she spent trying to

15   get the residue of Exhibit Number 2 off the tile with a rag

16   and water and the amount of time that she spent trying to get

17   the residue off the tile with Exhibit 2 using mineral

18   spirits, that information would have come only from her and

19   not from your personal knowledge; fair?

20 A   I would think that's correct, as far as I can remember.

21 Q   And I've listened to the recordings that were presented and

22   provided to us this week, and in at least one of those, maybe

23   two I think, you relayed some information to people with

24   respect to the amount of time that your wife was -- had spent

25   trying to scrub off the residue using the mineral spirits,

Page 16

1  and you indicated it was an hour -- more than an hour, which
2  is basically what she told us.  That's where you got the
3  information, was from her; true?
4 A  I think that's where it came from, yes.
5 Q  Because there was nobody else there?
6 A  Exactly.
7 Q  I asked your wife a lot of questions about her experience in
8  terms of when she first felt that there was something unusual
9  going on, and she explained that it was within a couple of
10  hours after she had finished working on her project that day.
11  Do you have any information to the contrary?
12 A  I think what she said is correct where I noticed issues that
13  she had.
14 Q  She also told us that she didn't observe any skin rash or
15  irritation until the morning after she used Exhibit 2 and the
16  mineral spirits.  Is that your recollection also?
17 A  I think that is correct.
18 Q  Do you remember where you guys went that night of the day
19  that she was working on this project?
20 A  Yes, we went to Meijer Gardens.  There was a concert there.
21 Q  Do you remember what you did between the time that she
22  stopped working -- what your wife did is what I really want
23  to know -- from the time she stopped working on the project
24  until the time you went to the Meijer Gardens for the
25  concert?

Page 17

1 A  I do not know what we did at that time.  I'm not exactly
2  sure.
3 Q  When your wife came to you and told you that the water wasn't
4  getting the residue off and wondered what you thought she
5  should do, did you walk over and take a look at the table?
6 A  I think I did.
7 Q  It was your understanding that she had finished applying the
8  product from Exhibit 2 onto the grout on the tabletop?
9 A  Yes.
10 Q  Exhibit 2 was probably capped and closed since she was done
11  using it at that point; is that your recollection?
12 A  I do not know if it was capped and closed.
13 Q  Do you know whether there was anything left in whatever the
14  little container was that she had poured Exhibit 2 into
15  before she applied it?
16 A  I do not remember.
17 Q  When she came to you, was she wearing any type of protective
18  gear?
19 A  She did have a pair of gloves on.
20 Q  Did she have any protective eyeglasses on?
21 A  She had regular glasses on.
22 Q  Was she applying this indoors, outdoors, in an open garage
23  door, where was she applying it?
24 A  Outdoors.
25 Q  When was the first time that you got involved with trying to

Page 18

1  figure out why your wife is experiencing the reaction that
2  she talked to us about this morning?
3 A  When was the first time you said?
4 Q  Yes.
5 A  Okay.  She had issues that evening at the concert.
6 Q  All right.  You didn't call anybody on your cell phone from
7  the concert to try and get information or anything, did you?
8 A  What's that?
9 Q  You didn't call anybody from the concert on a cell phone or
10  do anything while you were at the concert about trying to
11  figure out what was going on, did you?
12 A  No.  The only thing that was unusual about it was we were
13  sitting right next to each other and her nose was just
14  constantly dripping.
15 Q  My question was probably a little vague.  I asked her about
16  all of that stuff and I know about all of that stuff.
17 A  Okay.
18 Q  What I want to find out from you is when did you first take
19  an active role in contacting someone or researching something
20  or doing something to try and -- help try and figure out what
21  had happened and why your wife was experiencing these
22  symptoms?
23 A  It would be the following morning.
24 Q  What did you do then?
25 A  Called up the poison center.

Page 19

1 Q  And that's the recording that --
2 A  Yes.
3 Q  You made a recording of that phone call, right?
4 A  Yes.
5 Q  Did you record the entire phone call?
6 A  No, I did not.
7 Q  What part did you record?
8 A  I started recording it after I found the double label.
9 Q  Let me back up.  How many times did you call the Poison
10  Control Center?
11 A  That same day?  It was on the 13th.
12 Q  The day after your wife applied -- used the product?
13 A  Yes.
14 Q  And on that day how many times did you call the Poison
15  Control Center?
16 A  Just once.
17 Q  Did you ever call them after that day?
18 A  Yes.
19 Q  How many times after that day?
20 A  Two other times.
21 Q  And you recorded how many of those conversations of the total
22  three?
23 A  Just the first one.
24 Q  So on the first one -- did you talk to the same person each
25  time?

7 (Pages 16 to 19)

**Kane & Trap Court Reporting, Inc.**
services@kaneandtrap.com                    (616) 742-0700

Page 20

1 A   I'm not sure.
2 Q   The first time that you talked to them had you found the
3     label underneath the cover label on Exhibit 2?
4 A   Could you repeat that one more time?
5 Q   When you first called the Poison Control Center, did you know
6     that there were two labels on Exhibit 2?
7 A   Only after talking to them, and then they were asking me to
8     read the instructions -- or read the ingredients on it, and
9     then I noticed there was a double label, so actually while I
10    was talking to the poison center I took it off.
11 Q  When was the last time that you listened to the recordings
12    that you made?
13 A  I don't know.  Yesterday or so.
14 Q  Did you do that just to prepare yourself for today's
15    deposition?
16 A  Yes, I did.
17 Q  What else did you do to prepare yourself for the deposition
18    today?
19 A  That's about it.
20 Q  Did you review anything, any written records, materials,
21    anything like that?
22 A  Yes, we went over -- I went over what we had.
23 Q  What is what you had?
24 A  The materials that were given to my attorney -- or Yvonne's
25    attorney.

Page 21

1 Q   And what do those include?  I want to know what specifically
2     it was that you were looking at.
3 A   Everything from the Trace material to the e-mails and stuff,
4     reviewing those.
5 Q   Anything else?
6 A   No.  That's about it, I think.
7 Q   Were you in a meeting going over these things with anyone?
8 A   No.
9 Q   You just reviewed these on your own?
10 A  Yes.
11 Q  All right.  Going back to the telephone calls with the Poison
12    Control Center, your recollection is that you would have
13    recorded just the first call to them?
14 A  Yes.
15 Q  What did you talk with them about in the second and third
16    times that you called them?
17 A  I talked about -- I think the following -- the other phone
18    call was my wife's -- the skin underneath my wife's nose was
19    peeling down.
20 Q  Did you give them anymore information about what she had done
21    that day when she was using these materials?
22 A  Did I give Poison Control --
23 Q  Yes.
24 A  For the second conversation?
25 Q  Yes.

Page 22

1 A   No, other than they still had my case on file, and I was just
2     saying my wife still has these issues and they were saying is
3     there anything else I need to do.
4 Q   Was there anything more specific that you gave them on your
5     third phone call to them with respect to your wife's use of
6     materials on the day of this incident?
7 A   I'm not exactly sure what that whole conversation was.  It
8     was either talking about the materials or -- I'm not exactly
9     sure what that conversation -- it was a real short
10    conversation.
11 Q  In the conversations that you had with Michael Yablon, you
12    learned, by the way -- let me back up.
13         Before you called Mosaic Mercantile, you had
14    learned that there were two labels on Exhibit 2; is that
15    true?
16 A  That is correct.
17 Q  And when you realized that there were two labels on
18    Exhibit 2, did you peel back the top label to see that the
19    label underneath was for a grout primer?
20 A  Yes.
21 Q  And then I presume that you read the information on the grout
22    primer label?
23 A  To the poison control, yes.
24 Q  You probably read it to yourself first or maybe at the same
25    time?

Page 23

1 A   Actually at the same time.
2 Q   And then you compared what was on that label to the label
3     that was on the outside of the container?
4 A   Yes.
5 Q   Did you draw a conclusion in terms of whether the grout
6     primer product was stronger or weaker than the grout sealer
7     product?
8 A   I had no idea other than there was -- my wife had a health
9     issue, and I was just trying to get to the bottom of what
10    caused it.
11 Q  Did you compare the warnings and instructions on one label to
12    the other one and try to conclude which one of these might
13    have stronger ingredients in it than the other?
14 A  Yes, I did.
15 Q  And when you did that, what did you conclude?
16 A  According to the label, it says the primer has more issues.
17 Q  At that point you presumed that what was in Exhibit 2 was
18    primer, didn't you?
19 A  I think that's correct.
20 Q  And that's why you then called -- one of the reasons you
21    called Mosaic Mercantile, because you were reporting to them
22    what you believed was a mislabeling of Exhibit 2?
23 A  Looks like it to me, yes.
24 Q  In fact, I've listened to the conversations that you had with
25    Michael Yablon, and you told him that several times during

**Kane & Trap Court Reporting, Inc.**
services@kaneandtrap.com
(616) 742-0700

Page 24

1  the conversation, that it was mislabeled; right?
2 A  Yes, it was mislabeled.
3 Q  Did you understand from what he was telling you in that
4    conversation that in fact what was really in this container
5    was the sealer which is what the outside label said was in
6    the container?
7 A  Not completely.  I didn't completely understand it because of
8    the issue that we had with the product.
9 Q  And I figured you didn't understand it, because you said it
10   three times or so, that it was mislabeled and it has this
11   primer instead of sealer, but he tried to explain two or
12   three times that, no, it is a sealer, but it seemed to me
13   from listening to that that you just weren't understanding
14   that part.
15       What's your understanding today?  Do you understand
16   today that what is in reality in Exhibit 2 is a sealer and
17   not a primer?
18       MS. McLEAN:  Objection as to the form of the
19   question.
20 BY MR. STEC:
21 Q  Go ahead.
22       MS. McLEAN:  Also, the other objection is assuming
23   facts not in evidence.  Although the lab report, as you know,
24   says it's consistent, it doesn't actually say it is.
25

Page 25

1 BY MR. STEC:
2 Q  What's your understanding of what is the liquid that's
3    actually in Exhibit 2?  Is it a sealer or a primer?
4 A  Other than what the experts say from Trace Lab or whatever, I
5    have to go by what they have to say.
6 Q  What do they say?
7 A  They say it's similar to some type of a sealer, I guess.
8 Q  They basically report -- in fact, it's sitting right in front
9    of you, Exhibit 5, if you want to look at it.  They basically
10   reported back to you that the contents of Exhibit 2 are
11   similar to typical sealer ingredients -- I'm not using the
12   exact words, but basically that's the message.  Is that what
13   you understood?
14 A  I think that's what they're saying, yes.
15 Q  Have you talked to anyone else that you consider to be an
16   expert who has given you any opinion other than that, that
17   any of the contents in Exhibit 2 are not typical of what you
18   would find with a grout sealer?
19 A  I have not talked to anybody else.
20 Q  The only people that you've talked to to analyze and to get
21   information from with respect to the ingredients of this,
22   outside of Mosaic Mercantile, have been the people at Trace?
23 A  Correct.
24 Q  As part of Exhibit 5 there's an MSDS sheet for the ceramic
25   grout primer.  Did you see that?

Page 26

1 A  Yes.
2 Q  Did that MSDS sheet for the primer come from Trace
3    Laboratories?
4 A  No.
5 Q  Where did that come from?
6 A  I'm not sure.
7 Q  Did you obtain it?
8 A  No, I did not.
9 Q  I don't know that it was included with the July 16, 2006,
10   cover letter on that exhibit, so that's why I'm asking these
11   questions.  I mean, I've included it in the exhibit, but I
12   personally don't know if they sent it to you or not.
13 A  Yes, I have no idea.
14 Q  Have you seen that MSDS sheet before today?
15 A  Yes, I have.
16 Q  Is that some of the information that you provided to your
17   wife's attorney in this case?
18 A  I really don't know where it came from.
19 Q  You don't know whether your wife's attorney's office got that
20   or whether you got that?
21 A  Exactly, or if Trace came -- if it came from Trace or
22   whatever.
23 Q  So it may have come from Trace; you're just not sure?
24 A  I'm not sure.
25 Q  But whenever it was that you first saw this MSDS, did you

Page 27

1    read it?
2 A  No, I did not.
3 Q  I want to go over just a couple of things on it with you
4    right now.  If you look at the top, just underneath the black
5    written 1739, there's a Section 1, and underneath that it
6    says, "Product Name," and it says, "Primer."  Do you see
7    that?
8 A  No, I do not.
9 Q  Product name, primer.  Do you see that?
10 A  Yes.
11 Q  Further down it says Mosaic Mercantile.  Do you see that?
12 A  Yes.
13 Q  Go over to the right of that, and it tells us -- it
14   apparently tells us the manufacturer.  Do you see that?
15 A  Yes.
16 Q  It says Triangle Coatings.  Then if you go down, right in the
17   middle of the page -- I'm pointing with my pen to some words
18   that are underneath the Section 2 that says Composition
19   Information and Ingredients.  Read that for us.
20 A  It says, "No hazardous materials are contained in this
21   product."
22 Q  Do you remember seeing that before today?
23 A  No.
24 Q  Then if you go down further, under Section 3 where it says,
25   "Hazards Identification," about halfway down there it talks

**Kane & Trap Court Reporting, Inc.**
services@kaneandtrap.com
(616) 742-0700

Page 28

1    about -- for inhalation, it says effects of overexposure,
2    dash, inhalation, and what does that say?
3 A  It says: "No hazard in normal industrial use."
4 Q  So this is the MSDS for the product from Mosaic Mercantile
5    that you thought had the stronger ingredients in it than the
6    sealer, right?
7 A  That is correct.
8 Q  As you sit here today, have you seen any MSDS or any product
9    literature anywhere that suggests that there is anything
10   toxic or hazardous in the ingredients of the product that's
11   in Exhibit Number 2?
12 A  I'm not sure.
13 Q  Well, you either did or you didn't see something that
14   suggests that there's toxic or hazardous ingredients in that.
15   Which one is it, have you or haven't you?
16 A  I don't really understand the question of what you're trying
17   to ask.
18 Q  I'm trying to find out from you if you have seen any written
19   information anywhere that tells you that there's hazardous or
20   toxic ingredients contained in Exhibit Number 2?
21 A  Other than just the label that's on it where it talks about
22   on the primer -- where they talk about it being a hazardous
23   material.
24 Q  But how about with sealer, have you seen anything to suggest
25   that Mosaic Mercantile's Mosaic Grout Sealer has any toxic or

Page 29

1    hazardous ingredients in it?
2 A  I'm not sure.  I don't see it.
3 Q  As you sit here today, do you think that your wife was using
4    mosaic tile primer or mosaic tile sealer on the day that she
5    was working on her tile project?
6 A  I'm not really sure.
7 Q  You assumed that it was the primer.  I think we already
8    established that, right?
9 A  I'm not really sure, actually.
10 Q  And you're assuming that your wife's skin rash, sensitivity
11   to her nasal passages, peeling of the skin underneath her
12   nose -- you're assuming that all of that was caused by her
13   use of what was in Exhibit 2, aren't you?
14 A  Yes.
15 Q  And, by the way, have you gone to any of her medical
16   appointments with respect to her complaints that arose when
17   she was working on things that day?
18 A  Yes, I have.
19 Q  Any of the doctors while you were present ever say that what
20   her symptoms were were caused by use of what's in Exhibit 2?
21 A  They weren't sure.
22 Q  When you were there, did anyone inform them that she was
23   using mineral spirits that afternoon?
24 A  I don't know -- I don't think -- I don't know if they asked.
25 Q  And you didn't tell them, did you?

Page 30

1 A  No.
2 Q  And you didn't hear your wife tell them, did you?
3 A  I don't think so.  I'm not sure.
4 Q  It's not in the medical records anyway.
5 A  Oh.
6 Q  So the doctors didn't know that she had been using mineral
7    spirits for more than an hour that day, did they, as far as
8    you're aware?
9 A  I am not sure.
10 Q  Did you attempt to locate an MSDS for the Mosaic Mercantile
11   Sealer?
12 A  Did I obtain or --
13 Q  Did you try to find the MSDS for the sealer, if there is one?
14 A  I don't think so.
15 Q  Did you go online to research anything about anything that
16   pertained to this case?
17 A  Just what the evidence -- or what's been submitted so far --
18   just about the information about what caused and -- what
19   happened to my wife.
20 Q  What information is that?  See, my question wasn't -- I want
21   to make sure you understand.  I'm trying to find out if you
22   went on the internet and started looking for any information
23   that pertains to Mosaic Mercantile Grout Sealer or primer or
24   anything else?
25 A  Other than ordering it -- I ordered the primer, and there was

Page 31

1    a reaction that my wife had, and -- I didn't really
2    investigate; I'm not a chemist.
3 Q  I think the answer to my question is that other than going
4    online to try to find the mosaic tile primer that you wanted
5    to buy, you didn't conduct any internet research about the
6    ingredients in the primer versus the sealer or try to find
7    MSDS sheets for either one or potential reactions to people
8    who use either product; you didn't do any of that?
9 A  I don't think so.
10 Q  And that probably tells me the answer to my next question.
11   Did you make any efforts to research the -- or to find an
12   MSDS for mineral spirits?
13 A  I don't think so.
14 Q  Did you read the warnings and instructions on the label on
15   the mineral spirits container that you told your wife to use
16   to try and get the residue off these tiles before she used it
17   that day?
18 A  Can you repeat that again?
19 Q  Did you read the label on the mineral spirits container that
20   your wife used that day?
21 A  No.
22 Q  After she had this reaction from what everyone thinks was
23   going on that afternoon, did you ever go back and read the
24   label on the mineral spirits?
25 A  I'm not sure.

10 (Pages 28 to 31)

Page 32

1 Q   Is that mineral spirits container still available?
2 A   I don't know if we have it.
3 Q   Have you tried to locate it anytime recently?
4 A   It's down in our workshop if it would be there, and it would
5     just be amongst a bunch of materials, and I personally
6     haven't tried to look for it, as far as I can recall.
7 Q   Your wife told me that she tried to find it yesterday but
8     couldn't. Did she ask you, hey, Honey, do you know if we
9     still have that mineral spirit container around here?
10 A   There was -- she was looking for it, and I said it's
11    downstairs, and there was a bunch of materials and stuff down
12    there, my workshop was a mess, and -- like I said, it's been
13    so long I don't really remember if it would be there or not.
14 Q   Will you do me a favor and look for it?
15 A   Sure, I guess I'll give it a try.
16 Q   I can send your attorney a formal demand if I needed to, but
17    it would just be easier if you -- if you find it, keep it;
18    don't get rid of it, okay?
19 A   Sure.
20 Q   In your conversation with Michael Yablon -- and you just
21    listened to it the other day you told me to prepare to come
22    here today -- you heard him struggle with trying to make
23    sense of what you were reporting to him from your wife's use
24    of their product. You would agree with that summary to some
25    extent?

Page 33

1 A   I would think that we were at opposing thoughts, but -- he
2     had his thoughts and I had my thoughts.
3 Q   Well, you had made some conclusions before you made the phone
4     call, and he was listening to the conclusions you made and
5     trying to figure out if that was possible with the use of
6     their products in part; do you agree with me?
7 A   At that time when I talked to him I still believed that it
8     was the sealer.
9 Q   I know. But he was having a hard time agreeing, because --
10    he said it more than once, that there's nothing really
11    harmful in there, there shouldn't be that response to the use
12    of the product. I'm not saying the exact words, but that was
13    the message that he said to you a couple of times. Do you
14    remember that?
15 A   Yes, he said something similar to that.
16 Q   In fact, he also said, when you told him that your wife was
17    using the mineral spirits, that, you know, maybe this had
18    something to do with using that in conjunction with the
19    mineral spirits. Do you remember him saying that?
20 A   Yes, he did say that.
21 Q   And when he said that, you didn't go out and do any research
22    or ask any questions of anybody to figure out whether the
23    mineral spirits might have some explanation for what was
24    going on with your wife?
25 A   At that time I probably would think that my wife has been

Page 34

1     around mineral spirits and there was never an issue.
2 Q   But that really wasn't my question. My question was, and
3     after him saying that, you never went out to do any research
4     or ask anybody questions to try to figure out if the mineral
5     spirits had anything to do with what she was experiencing?
6 A   No, I did not.
7 Q   I've got a Material Safety Data Sheet for mineral spirits.
8     You've never seen one of those probably, have you?
9 A   Huh-uh.
10 Q   Is that a no?
11 A   No.
12 Q   Did you know that under -- as opposed to that MSDS that says
13    that there's no hazardous materials in the product, that for
14    mineral spirits it says there are hazardous materials in the
15    product. In fact, it says hazardous in case of skin contact,
16    which is an irritant; hazardous with eye contact, which is an
17    irritant; hazardous with inhalation. Did you know that?
18 A   No.
19        MS. McLEAN:  I'm going to object as to the
20    relevance, because we've already established that it's not a
21    primer that was in that bottle. It was more likely a sealer,
22    but it's certainly not a primer, which is what we're
23    comparing the two MSDS --
24        MR. STEC:  The primer is more toxic. Toxic is the
25    wrong word. The primer is stronger with the ingredients in

Page 35

1     the sealer, but my co-counsel -- or the other defendant will
2     have the people that talk about that.
3 BY MR. STEC:
4 Q   So I'm just asking about whether you were aware before this
5     lawsuit was filed and from the research -- and you did a lot
6     of work to try to figure out what was going on with your
7     wife's reaction to what you thought was the product, and you
8     believed it was mislabeled and all of that stuff, but the
9     mineral spirits MSDS tells us under toxicological information
10    that there's chronic effects on humans, that it can be toxic
11    to the lungs and the nervous system. Did you know that?
12 A   No, I did not know that.
13 Q   Did you know that other toxic effects on humans include
14    hazardous in case of skin contact?
15 A   No. No, I did not know that.
16 Q   Did you know that another toxic effect on humans is that it's
17    hazardous if it's inhaled?
18 A   Apparently not.
19 Q   All right. Those things sound a lot worse than the MSDS with
20    respect to the primer, don't they?
21 A   I'm not a chemist.
22 Q   I know, but neither am I. Don't they sound worse to you than
23    what's on that Exhibit 5, the MSDS for the primer?
24 A   I guess what the records read let them read. Like I said,
25    I'm not a chemist; I can't analyze everything.

11 (Pages 32 to 35)

**Kane & Trap Court Reporting, Inc.**

services@kaneandtrap.com                           (616) 742-0700

Page 36

1 Q    Did any chemist tell you that there was anything toxic in
2      Exhibit 2?
3 A    I never talked to another chemist.
4 Q    So no chemist ever told that what your wife experienced might
5      be caused by what's in Exhibit 2 either, did they?
6 A    I never talked to one.
7 Q    So all this lawsuit was filed on was based upon an assumption
8      that what she experienced was caused by what was in
9      Exhibit 2, right?
10 A   I was with -- I was just looking out for my wife's injuries.
11 Q   This lawsuit was based upon your assumption that your wife's
12     injury was caused by what was in Exhibit 2?
13 A   I would think so, yes.
14 Q   No doctor told you that, right?
15 A   The doctors did say there is a possibility that there was a
16     reaction.
17 Q   They didn't know she was using the other chemical that
18     afternoon.  They didn't know whether this did it.  In fact,
19     did you give them this product to look at, the doctors?
20 A   No, I did not.
21 Q   Did you give them the label to look at, to read what was in
22     it?
23 A   No, I did not.
24 Q   Did you tell them what the label said the ingredients were?
25         MS. McLEAN:  I'll object, because we already know

Page 37

1      that what's in the product is not what's on the label.
2 BY MR. STEC:
3 Q    Did you give them the analysis that was done by Trace?  Did
4      you give that to your wife's doctors so they could look at
5      that to see whether or not that might possibly explain what
6      was going on with her?
7 A    No, because the Trace was after.  We went to the doctors
8      before.
9 Q    But even after you got this from Trace, sometime in July of
10     2008, and before this lawsuit was filed, you never went back
11     to the doctors to say, here's what Trace says, can you tell
12     me whether or not what my wife was experiencing could have
13     been caused by this?  You didn't do that, did you?
14 A   Not at that time, no.
15 Q   At any time?
16 A   I don't think so.
17 Q   The Trace people didn't tell you that your wife's symptoms
18     had anything to do with what they found in this exhibit, did
19     they?
20 A   Trace's job was to compare the double layer compared to the
21     single label.
22 Q   I understand.  But my question was they never told you that
23     what was in Exhibit 2, the double label, had anything to do
24     with your wife's complaints, did they?
25 A   I don't think so; I'm not sure.

Page 38

1 Q    Well, we've come full circle, because I'm trying to find out
2      from you whether there was any evidentiary basis other than
3      your belief that your wife's injuries were caused by this
4      product from any source.  Was there?
5 A    If it dried clear like Mosaic said it would have, my wife
6      wouldn't have been having to take it off.
7 Q    That doesn't answer my question.  My question is -- and I see
8      what was done on these tiles and putting some of these
9      products on it, and, you know, you and I can sit here and
10     argue about whether the double label sealer dries clear or
11     not on this blue piece of tile, but my question is different
12     than that.
13         My question is this federal lawsuit was filed suing
14     my client and making allegations with respect to a product in
15     Exhibit 2 without any supporting opinion from a doctor, a
16     laboratory, a chemist, or any expert anywhere that this
17     product had anything to do with your wife's injuries; isn't
18     that right?
19         MS. McLEAN:  I'm going to object to the form of the
20     question, because there is a lab report that tells that there
21     are four -- that there's a difference between what should
22     have been in there and what is actually in there.
23 BY MR. STEC:
24 Q    That wasn't my question.  Do you want me to have my question
25     read back?

Page 39

1 A    If you could rephrase it, yes.
2 Q    I'm going to have her read it back just the way I said it,
3      and if you're confused with any part of it, tell me, and then
4      I'll rephrase that part, but I think it's pretty clear.
5         MR. STEC:  Could you read it back, please?
6         (Last question read back by the reporter.)
7         THE WITNESS:  I can't understand it.  I don't
8      understand the question -- or I can't answer it, I don't
9      know.
10 BY MR. STEC:
11 Q    When the lawsuit was filed, you either did or did not have an
12     opinion from someone who's an expert -- medical, chemist,
13     laboratory, whatever possible expert there is -- that what's
14     in Exhibit 2 either did or did not explain your wife's
15     symptoms.  Did you or didn't you have an expert opinion from
16     someone on that issue?
17 A    I thought I got the information from either the doctors or
18     Trace Laboratories saying that there was a difference that
19     could have caused it.
20 Q    Trace Laboratories saying that there's two additional
21     ingredients in Exhibit 2 than there are in Exhibit 3 isn't an
22     expert report that no matter what it is in Exhibit 2 --
23     whether it's 4 ingredients or 40 -- had anything to do with
24     your wife's injury, okay?  So, again, I'm going back to my
25     question.  Who at Trace or which doctor said that any of the

12 (Pages 36 to 39)

**Kane & Trap Court Reporting, Inc.**
services@kaneandtrap.com                        (616) 742-0700

Page 40

1  four ingredients in Exhibit 2 could explain, or did explain,
2  your wife's condition?
3 A  I'm not sure. I really --
4 Q  The answer is nobody, isn't it, sir?
5       MS. McLEAN:  Object as to leading.
6       MR. STEC:  I can lead. He's an adverse witness.
7       THE WITNESS:  I'm not trying to be adverse. I'm
8  just saying --
9 BY MR. STEC:
10 Q  No, I'm not saying you're being adverse. That's a legal
11  term. That's not describing your personality.
12 A  Okay. Other than the incidents that happened to my wife
13  and -- I guess I was just going by what all my wife's medical
14  issues were.
15 Q  And I understand. I don't want you to think that I'm not
16  sensitive to your wife's discomfort and all the stuff she
17  went through. You know, I've seen the medical records, and I
18  talked to her this morning, and I understand that she had a
19  reaction, there's no question. But there's certainly a
20  question as to whether it was a reaction from using what's in
21  Exhibit 2 for ten minutes or perhaps maybe from the mineral
22  spirits that are far more harmful for over an hour, okay?
23  I'm just trying to verify that nobody ruled out the fact that
24  the mineral spirits probably explain this and not what's in
25  Exhibit 2.

Page 41

1 A  Well, if I'm -- I think possibly my wife has probably used
2  mineral spirits and she's never had a reaction before.
3 Q  It depends on how long you use it, how close you are to it,
4  and all of those things. I'm sure you would probably agree
5  with that?
6 A  Possibly, yes.
7 Q  But here we are in this lawsuit, and here I am taking your
8  deposition today and taking your wife's deposition today, and
9  I'm trying to find out what evidentiary support there is for
10  these allegations, and what I'm hearing is that the lawsuit
11  was filed with your assumption that, A, this Exhibit 2 was
12  mislabeled, and, therefore, because it was mislabeled that
13  must be why my wife suffered these injuries. That's
14  basically what it's based on, isn't it?
15 A  I'm not really sure.
16 Q  What are you unsure about?
17 A  There was some type of thing that my wife had that caused an
18  effect, and that was the only thing she's ever used that
19  caused the effect.
20 Q  But what do you have that supports that conclusion other than
21  your just supposition?
22 A  I guess just that and what we've talked to -- the doctor
23  saying there was -- she could have had a reaction to the
24  chemical or to the sealer.
25 Q  All right.

Page 42

1       MS. McLEAN:  Is this a good time to take a break?
2       MR. STEC:  We can do that. I don't think I have
3  any other questions, but I'll look at my notes for just a
4  minute.
5       (Recess held from 2:32 p.m. until 2:40 p.m.)
6 BY MR. STEC:
7 Q  I do have a few other questions.
8       Exhibit 3, which was the other bottle of sealer
9  that you bought -- well, the only bottle of sealer that you
10  bought from Hobby Lobby -- was opened, and I know that a
11  sample was taken from it that was used by the Trace
12  Laboratory people; is that right?
13 A  That's correct.
14 Q  Did they remove the volume of material from Exhibit 3 that
15  they were going to use in the sample or did you?
16 A  They did.
17 Q  Did you go to Muskegon with both of these bottles?
18 A  Yes, I did.
19 Q  Did you deal with the lady whose name is on the front page of
20  Exhibit 5?
21 A  I am not exactly sure if it was Gina that I gave the
22  materials to.
23 Q  Did they remove the contents while you were there?
24 A  Yes, they did.
25 Q  Do you know how much they removed?

Page 43

1 A  I do not know the quantity of it.
2 Q  And you were there when they also removed the sample from
3  Exhibit 2, weren't you?
4 A  Yes, I was.
5 Q  Did they remove the same volume of Exhibit 2 as they did from
6  Exhibit 3?
7 A  Yes.
8 Q  I presume they would have put them in some sort of sterilized
9  container?
10 A  Yes.
11 Q  And then they would have then used those samples for their
12  testing?
13 A  I would assume.
14 Q  And I also know that because of the two tiles that are here
15  that you used a small amount of product from each of these
16  three bottles on this blue tile, didn't you?
17 A  Correct.
18 Q  And another small amount of product from Exhibits 2 and 3 on
19  the burgundy tile?
20 A  Yes.
21 Q  And in the process of doing what you did with these tiles,
22  did you dump the contents of these respective containers into
23  some other container?
24 A  I had -- I tried to have exactly two similar containers with
25  two different brushes to brush them on so I wouldn't

Page 44

1   contaminate each of them.
2 Q   What type of container -- it had to be three containers,
3   right?
4 A   Yes.
5 Q   What type of containers did you use?
6 A   I'm not exactly sure, but if it would be anything, it would
7   be like -- maybe like a plastic dish or something like that
8   that we had.
9 Q   Like an old butter container or what?
10 A   I'm not exactly sure where it came from, but I tried to make
11   sure to make it completely -- so the materials wouldn't be
12   contaminating each other.
13 Q   Did you shake each container before you applied them to these
14   two tiles?
15 A   I think I did.
16 Q   You're not sure?
17 A   I'm not.
18 Q   Maybe you didn't --
19 A   I would have -- I'm not exactly sure, but I would think I
20   would have.
21 Q   Maybe you did and maybe you didn't?
22 A   Possibly, yes.
23 Q   Did you wear any protective clothing when you did this?
24 A   No.
25 Q   Did you use different brushes or did you clean the brush you

Page 45

1   used in between it being used to apply?
2 A   I used three separate brushes.
3 Q   It sounds like you would have opened, for example, Exhibit 2,
4   and to use a little bit of its contents on the two tiles,
5   you're telling me that you poured this into a different
6   container versus just putting like a drop on each tile and
7   then brushing it that way?
8 A   I'm thinking that I put it in three separate, different
9   plastic containers.  We have a lot of the -- those containers
10   around, I guess, and I'm thinking that's what I did, but I
11   wanted to make sure that everything was totally separated.
12 Q   Did you photograph or videotape any of that process?
13 A   No, I did not, not the actual --
14 Q   Now, one of the questions that I have, though, is -- and you
15   can pick up Exhibits 2 and 3 if you want to.  If you shake
16   Exhibits 2 and 3, it seems like there is more gone from
17   Exhibit 3 than there is from 2, and I'm wondering if you have
18   an explanation for that.  Do you agree with me, Exhibit 2 has
19   more in it?
20 A   I'm not sure.  You can't see it.
21 Q   Right, I know, and some day we could probably just dump them
22   out and measure it, but if you just shake it, it seems like
23   you can tell that there's more in Exhibit 2 than there is 3,
24   and so I'm trying to figure out, if in fact that turns out to
25   be the case later on, do you have an explanation where the

Page 46

1   rest of the contents of Exhibit 3 are or what they were used
2   for?
3 A   I can't explain it; I have no idea.
4 Q   Did you do anything else in terms of a test, an analysis, or
5   anything other than what we see in these two tiles with use
6   of the contents of any of these three containers?
7 A   No, I think that's pretty much it, I think.  I'm not
8   100 percent sure, but I would assume that's the case.
9 Q   Did you tell your wife how to apply the mineral spirits when
10   she was going to use that on the table that day?
11 A   Other than I think she used a cloth -- I'm not exactly sure,
12   but I thought she used a cloth to try to wipe it away.
13 Q   Do you know whether she poured the mineral spirits into a
14   separate container or whether she just turned it upside down
15   with a cloth at the opening to get some on the cloth and used
16   it that way?
17 A   I do not know.
18 Q   Do you know what she used to apply -- whatever you want to
19   call what's in Exhibit 2, what she used to apply that to the
20   grout on the table?
21 A   Some type of brush.  I'm not sure what.
22 Q   You didn't observe her doing that, though?
23 A   Not that I really paid any attention to.  I was just walking
24   by her.
25 Q   Are you assuming she used a brush, or do you know for sure?

Page 47

1 A   I'm not sure.
2 Q   Before this incident, had your wife ever been treated for any
3   type of upper respiratory infections or bronchitis or
4   anything like that?
5 A   No, she pretty much -- she's had some flu incidents and that
6   was about it.
7 Q   Do you guys have any family pets, or have you had any family
8   pets in the last three years?
9 A   No, we have not.
10 Q   Do your children have family pets?
11 A   No.
12 Q   Your wife told me she does some gardening.  Does she?
13 A   Yes.
14 Q   Does she do most of that work outside?
15 A   Yes.
16 Q   Has she ever had occasions of having a reaction to any type
17   of plant life that you can recall?
18 A   I can't remember anything.
19 Q   Has she ever taken allergy medications, to your knowledge?
20 A   Prior?
21 Q   At any time.
22 A   At any time?  I think she was given some type of medicine
23   after the fact trying to find out the cause of her problems.
24 Q   Was that just for a limited period of time?
25 A   Yes, I think so.

14 (Pages 44 to 47)

Page 48

1 Q  I'm trying to find out if she's been on longer periods of
2    allergy medication.
3 A  I didn't understand that.
4 Q  Other than that, given the steroidals and the things that the
5    doctors did shortly after this reaction, or whatever it was,
6    has she been on either over-the-counter or prescription
7    allergy medications?
8 A  No, I do not think so.
9 Q  Do you have allergies?
10 A  No.
11 Q  Do you know if your wife has ever had an allergy test to
12    figure out if some of what she's complaining about may be
13    caused due to a late onset of allergies?  When I say late
14    onset, you know, as you get older, sometimes you develop
15    allergies, it just happens.  Has she had any tests to figure
16    that out?
17 A  I'm not sure.
18 Q  Other than what we see in Exhibit 5, have you had any other
19    communications with people from Trace Laboratories with
20    respect to any of the work that they did?
21 A  Other than just the reports and I think I had an e-mail from
22    them or something like that.
23 Q  I think that might be included in here.  That e-mail?
24 A  Yes.
25 Q  You didn't have any discussions with them about whether the

Page 49

1    contents that they found in Exhibit 2 might explain your
2    wife's symptoms or her problems, did you?
3 A  Other than it has more materials and there's a couple of
4    different -- comparing them, my concern is is there any
5    difference between the sealer single label as compared to the
6    double label product.
7 Q  No, I understand, but those are two separate and completely
8    different things.  The issue of whether the contents of
9    Exhibit 2 are the same as the ingredients in Exhibit 3 is one
10    issue.  I understand that's what they looked at, but my
11    question is different.  My question is, did anybody there
12    suggest to you that the contents or the ingredients that they
13    found in Exhibit 2 might explain your wife's symptoms?
14 A  I'm not sure if anybody said that one way or the other; I'm
15    not sure.
16 Q  You didn't ask them that, did you?
17 A  I'm not -- being three years ago, I can't remember.
18       MR. STEC: I don't have any other questions. Thank
19    you, sir.
20       E X A M I N A T I O N
21 BY MS. FEKARIS:
22 Q  Hi, sir.  Cleo Fekaris.
23 A  Hi.
24 Q  I have just a few questions.  You were asked some questions
25    earlier about whether the product that you ordered online --

Page 50

1    I'm sorry, the primer you ordered online and the sealer you
2    purchased at Hobby Lobby?
3 A  Yes.
4 Q  With either of those products you indicated -- I'm sorry, you
5    couldn't recall if there was a foil seal.  Was there a
6    cellophane wrapper around them or anything keeping it closed?
7 A  There was no cellophane over it.
8 Q  Do you know where your wife was doing this project outdoors?
9 A  It was -- we have a walkout basement.  She was doing it
10    outside underneath the deck.
11 Q  You also indicated that you had three conversations with
12    poison control, and you recorded the first conversation -- or
13    at least a portion of the first conversation.  Do you recall
14    when you had the second conversation?
15 A  Probably, I would think, approximately maybe a week, week and
16    a half ago -- a week, week and a half later.
17 Q  You also indicated that you discussed with them or you
18    mentioned to them the peeling of the skin under her nose
19    during that second conversation?
20 A  Yes.
21 Q  Did you mention to them during that conversation anything
22    about the mineral spirits?
23 A  I'm not sure.
24 Q  Do you recall with whom you spoke at poison control during
25    that second conversation?

Page 51

1 A  No.
2 Q  Do you know the name of the person with whom you spoke the
3    first time you called poison control?
4 A  No, I don't recall that at all.
5 Q  And the third conversation that you had with poison control,
6    do you recall when that occurred?
7 A  I'm estimating possibly maybe a week or so after that, too,
8    for some follow-up questions about some issues with that.
9 Q  A week or two after the --
10 A  Second.  I'm not exactly sure on the time frame.
11 Q  When you say second, you mean the second telephone call?
12 A  That is correct.
13 Q  And you had no more conversations with poison control other
14    than these three, correct?
15 A  That's correct.
16 Q  When you contacted poison control, did they ask for your
17    name?
18 A  I think so.
19 Q  Did they ask for your wife's name?
20 A  If they have it on record or something, I'm not sure.
21 Q  From the time that your wife worked with the product in
22    Exhibit 2 until you took it to Trace Analytic, where was that
23    product stored or that bottle stored?
24 A  At my house.
25 Q  Where?

15 (Pages 48 to 51)

Page 52

1 A   What room? I'm not exactly sure if that's what you're
2   asking. I have no idea.
3 Q   So you don't know if it was stored in the garage, the
4   basement, the washroom, the kitchen, you just don't know?
5 A   I can't remember.
6 Q   Did you ever pour anything into the bottle that has been
7   marked as Exhibit 2?
8 A   I have not.
9 Q   You never poured any of the contents out and then poured it
10   back into the bottle?
11 A   No.
12 Q   Has anyone ever done that?
13 A   I don't know.
14 Q   So from the time that this product was used then until you
15   took it to Trace Analytic, you're uncertain where it was
16   located and who had contact with it?
17 A   That's correct.
18 Q   Do you smoke?
19 A   No.
20 Q   Have you ever smoked?
21 A   Twenty-five years ago.
22 Q   Have you ever smoked during the course of your marriage to
23   Yvonne?
24 A   I think that's the year I stopped.
25 Q   Do either your children or Yvonne's children smoke?

Page 53

1 A   I think possibly her son smokes.
2 Q   Have they ever smoked inside your home?
3 A   Absolutely not.
4 Q   What did you do at General Motors?
5 A   Factory worker.
6 Q   Were you skilled trades?
7 A   No, I was not.
8 Q   Laborer, assembly --
9 A   Assembly, general assembly.
10 Q   General labor and assembly?
11 A   Yes.
12 Q   As a general laborer, did you have any move-up jobs where you
13   might from time to time work as an electrician helper or an
14   apprentice helper or something in that regard?
15 A   I was an auditor one time. I guess that would be a step up,
16   but basically nothing into a skilled trades.
17 Q   As a laborer would you clean?
18 A   Clean as --
19 Q   Clean up behind some of the skilled trades whatever products
20   they might drop on the floor?
21 A   No.
22 Q   When you would come home from work -- did you wear your work
23   clothes home?
24 A   Yes.
25 Q   Were they dusty?

Page 54

1 A   They were just clothes from a factory.
2 Q   Would your wife launder these clothes?
3 A   Absolutely.
4       MS. FEKARIS: I believe those are all the questions
5   I have.
6       E X A M I N A T I O N
7 BY MS. MCLEAN:
8 Q   What year were you and Yvonne married?
9 A   In 19 -- now you want me to think?
10 Q   I didn't ask you the date.
11       MR. STEC: At least I didn't try and get you in
12   trouble.
13       THE WITNESS: Okay. It was 1988, I think. June 2,
14   1988.
15 BY MS. MCLEAN:
16 Q   And during the course of your marriage, how many years did
17   you work at GM that she would have had to launder your
18   clothing that may have had dust in them?
19 A   Throughout --
20 Q   When did you retire, what year?
21 A   2006.
22 Q   When you created these tiles, was anybody watching you make
23   those tiles and/or watching your method?
24 A   No.
25 Q   Were you alone?

Page 55

1 A   Yes.
2 Q   Did Yvonne observe you do that?
3 A   I don't think so.
4 Q   Do you go with her to the doctor?
5 A   Yes.
6 Q   So would you know if she went to the doctor and was diagnosed
7   with an upper respiratory infection or the flu?
8 A   Yes.
9 Q   Do you know what the difference is?
10 A   Not completely.
11 Q   Do you know if she had, you know, an occasional -- like an
12   upper respiratory infection before the June 2008 incident?
13 A   Oh, yes.
14 Q   How many do you think she had a year?
15 A   I'd say possibly maybe one a year. Everybody usually gets
16   the flu once a year, possibly.
17 Q   Then after this exposure, what have you observed her health
18   to be?
19 A   It's been an ongoing -- it's been an ongoing problem.
20 Q   So you're saying she's not the way she was before she had
21   this exposure?
22 A   No.
23 Q   Do you need to take a minute or are you okay?
24 A   I'm fine.
25 Q   This Exhibit 2, can you identify this? Is this the bottle

16 (Pages 52 to 55)

Page 56

```
 1    that she used?
 2 A  Yes.
 3 Q  And how do you know it's the bottle?
 4 A  It's got the double label on it.
 5 Q  Okay.  And can you read for the record what ingredients I
 6    believe it says are in here?  Right there.  What ingredients
 7    does it say are in that container?
 8 A  Water, acrylic, polymer, textron, and thickeners.  That's
 9    about it.
10 Q  Do you recall what ingredients the lab said was in the
11    double-labeled product?
12 A  I'll have to read it.
13 Q  You can read it.
14 A  It has the Number 2-Butoxyethoxy, hyphen, ethanol.  And then
15    it also says:  2-methyl, 2-methylpropyl ester Propanoic Acid,
16    Butyl ester Butanoic Acid, and it's Di-n-butyl phthalate.  I
17    murdered the pronunciation of it.
18 Q  Are you familiar with any of those particular chemicals at
19    all --
20 A  No.
21 Q  -- in the double label?
22 A  No.
23 Q  So you're not familiar with ethanol?
24 A  Well, yeah.
25 Q  Are you familiar -- you are or you're not?
```

Page 57

```
 1 A  Well, ethanol I guess is -- you would think of it as some
 2    type of like a gas or you can run -- cars run off of it so --
 3 Q  What about Propanioc Acid?  Do you know anything about -- let
 4    me just ask you this explanation:  You have no chemical
 5    experience with these except what you know of ethanol; is
 6    that correct?
 7 A  Yes.
 8 Q  Do you know if any of those substances are dangerous
 9    substances?
10        MR. STEC:  Objection.  You've laid no foundation
11    that he would have any knowledge with respect to that.
12    Unless he says that, it's just pure speculation.
13 BY MS. MCLEAN:
14 Q  You can still answer the question, I guess.
15 A  I'm not a chemist.
16 Q  Did the lab tell you whether or not any of those chemicals
17    found in the double label were considered to be hazardous
18    substances?
19 A  Other than they pretty much just gave me what the report was.
20 Q  Did the lab tell you whether or not a combination of those
21    four chemicals could be potentially dangerous?
22 A  I'm not sure.  I'm not sure.
23 Q  And with respect to the -- I'm going to go back to Exhibit 2,
24    okay?  With respect to the label, did you understand this to
25    be a water-soluble product or an insoluble product from
```

Page 58

```
 1    having looked at the label?
 2 A  It says water soluble.
 3 Q  And do you have any reason to believe that using mineral
 4    spirits to clean that product off would have given any
 5    adverse reaction?
 6 A  No, that's the only way the project would be corrected.
 7 Q  Now, with respect to the sealer, if your wife had -- the
 8    single label sealer dried clear?
 9 A  Yes, absolutely crystal clear.
10 Q  And so your feeling is if it had dried clear, she wouldn't
11    have had to have taken it off?
12 A  Absolutely.
13 Q  Let me talk a little about these mineral spirits.  Did you
14    use them before this incident?
15 A  Before?
16 Q  Before the exposure in 2008.  Were they in your house before
17    2008?
18 A  Oh, yes, absolutely.
19 Q  Did you use them since the incident?
20 A  Yes.
21 Q  How frequently did you use them?
22 A  Oh, just if I was doing some type of a remodeling job where
23    I'm re-finishing some wood and stuff like that or had to
24    clean some brushes.
25 Q  Do you use it for any other reason?
```

Page 59

```
 1 A  No, pretty much to just do a project or cleaning off brushes
 2    or working on woodwork.
 3 Q  Do you know if Yvonne used the mineral spirits since the
 4    incident?
 5 A  Yes, she probably has.
 6 Q  Now, do you know if exposure to ethanol or exposure to
 7    mineral spirits -- if there's any possibility there's
 8    something similar in that exposure?
 9 A  I'm not sure.
10 Q  And is ethanol something you have laying around your house?
11 A  Not that I can recall.  I don't think so.
12 Q  What about mineral spirits, is that something you just have
13    around your house?
14 A  Yes, to do projects.
15        MS. MCLEAN:  Let the record reflect the witness got
16    emotional when he talked about his wife's health.
17 BY MS. MCLEAN:
18 Q  I'm going to go back to that topic now that you've stopped
19    getting emotional.  Tell me some things you've observed that
20    are different in Yvonne versus before the exposure.
21 A  She has a very distinct cough.  It's like a deep cough.  I
22    never heard her cough like that before.
23 Q  How often does she have those coughing -- I think we heard
24    her cough once during the dep today.  When do you observe her
25    to start coughing and how often does it happen?
```

17 (Pages 56 to 59)

**Kane & Trap Court Reporting, Inc.**

services@kaneandtrap.com

**(616) 742-0700**

Page 60

1 A   Any time she does any type of exertion. Sometimes it will
2     come on throughout the night when she starts getting these
3     real coughing spells that go on and on and on.
4 Q   And how often do you think she has these coughing spells now?
5 A   Months in between. It's almost an ongoing thing. She will
6     peak and have more coughing spasms and stuff and issues like
7     that about every other month or even monthly.
8 Q   She has an attack that you would say is more than an average
9     person having a couple coughs here and there?
10 A  Yes. Oh, absolutely, yes.
11 Q  Is it pronounced coughing?
12 A  Yes, it's a very distinct, irritating cough. It's so deep.
13 Q  Does it cause her to not do the things she did before?
14 A  Yes.
15 Q  And has it limited in any way your relationship together?
16 A  We can't do as much stuff. There's certain things we can't
17    go to if she starts having these coughing spells.
18 Q  What about her physical activity, is she as physically active
19    as she used to be?
20 A  She tries to be, yes.
21 Q  And when you say tries, is she successful?
22 A  We joined the Y, and she was trying to do some exercises
23    there, and the coughing kicks in and then she has to stop.
24 Q  When you talked with Mr. Yablon, did you talk to him after
25    you got the lab reports back?

Page 61

1 A   No. Actually, I talked to him before.
2 Q   Did you ever send him copies of the lab reports?
3 A   No, I did not.
4 Q   Did he ever discuss with you in detail what ingredients he
5     expected to be in the primer versus what was actually in the
6     primer?
7         MS. FEKARIS: Objection. There's no indication
8     that --
9         MS. McLEAN: I think Mr. Stec said that he told
10    Mr. Jakubowski that it was just sealer that was in the
11    sealer, that he --
12        MS. FEKARIS: Right.
13        MS. McLEAN: So he didn't know what was actually,
14    though, in that sealer. Maybe I'll rephrase the question.
15        MS. FEKARIS: Okay.
16 BY MS. McLEAN:
17 Q   Did Mr. Yablon indicate that he actually knew what
18    ingredients were in the double-labeled sealer?
19 A   He didn't actually know. They could either have been some
20    old materials or -- I don't recall. I think he pretty much
21    said possibly older material, and he kept on arguing saying
22    that it's not a primer -- it wasn't a primer, it's a sealer,
23    and I said, well, this is -- it's acting like a sealer or --
24    excuse me, it's acting like a primer, it's not crystal clear
25    like it should be.

Page 62

1 Q   Again, on the label, the actual label of Exhibit 2, can you,
2     again, read for the record what it says?
3 A   Okay. Let's see. Mosaic Grout Sealer is a nonflammable,
4     clear sealant to be applied over mosaic tile and grout to
5     repel water and protect the surfaces. Its MGS is specially
6     formulated to dry clear. Note: MGS is designed to shed
7     water but is not intended to waterproof mosaic objects
8     submerged in water.
9 Q   So it's clearly supposed to be a nonflammable substance; is
10    that correct?
11 A  Yes.
12 Q  And obviously also clearly water soluble?
13 A  Yes.
14 Q  Let me ask you this: Do you know if ethanol is a
15    nonflammable substance?
16        MS. FEKARIS: Objection. He's not an expert.
17        MS. McLEAN: I think that that's a product that he
18    already admitted was in gasoline.
19        THE WITNESS: Yes, it's in gasoline and that's all
20    I know. They use it for operating a car, running a car.
21 BY MS. McLEAN:
22 Q  And what type of an engine does a car have?
23 A  Combustible engine.
24        MS. McLEAN: Thank you. I have nothing further.
25

Page 63

1          R E - E X A M I N A T I O N
2 BY MR. STEC:
3 Q   Mr. Jakubowski, on that point, your wife's attorney just
4     asked you some questions about ethanol, I presume, because
5     that's one of the words that are used in the Trace e-mail of
6     July 22, 2008, but when you look at the full chemical
7     composition name of that, in -- there's the number 2, then
8     there's a dash, and then in parentheses it says -- there's
9     another number 2 with a dash, butoxyethoxy, end of
10    parentheses. Do you see that?
11 A  Yes.
12 Q  And then after that it says ethanol?
13 A  Yes.
14 Q  Do you have any idea what the word in parentheses means and
15    whether that means it's something different than ethanol
16    as you understand ethanol in terms of its use in a motor
17    vehicle?
18 A  I would not know the definition of the word that you just
19    said.
20 Q  If you go home tonight and you remember that, or write it
21    down, and you go online and you look it up, here's what
22    you're going to find out, just so you know that when you
23    leave here today, because I'm not going to get a chance to
24    probably ever see you again or talk to you unless this case
25    goes to trial.

18 (Pages 60 to 63)

Page 64

1 A    Okay.
2         MS. McLEAN:  Mr. Stec, I think he can look it up
3    himself.
4 BY MR. STEC:
5 Q    Well, what that ingredient is is it's primarily used as a
6    solvent and a dilutant, and it's favored because of its low
7    toxicity.  It's used in paints as a hardener, and it's used
8    in perfume because it evaporates quickly, and so the use in
9    this product is because it's low toxic -- meaning it doesn't
10   harm anything -- and it dries quick.  You didn't know that
11   until just now, did you?
12 A   I just heard it from you just moments ago.
13 Q    Right.  And the second ingredient in Exhibit 2 that's
14   different from Exhibit Number 3 -- if you go look that up,
15   you will also find out that that's a substance used in
16   cosmetics, including nail polishes, and it also has very low
17   toxicity, it doesn't harm anything.  You didn't know that
18   until just now either?
19 A   Just by what your statement says.
20 Q    So basically what that -- if a chemist were here -- and at
21   some point if anybody gets an expert in this case who knows
22   chemistry and all this stuff, they're going to know a lot
23   more about this stuff than I do, because I just went online
24   and did the research myself, but they'll tell you that those
25   two extra additives in Exhibit 2 that make it different from

Page 65

1    Exhibit 3 are totally harmless, and no one has told you
2    otherwise, have they?
3 A    I guess not.
4 Q    There were some discussions in the tape-recorded
5    communications that you had with Mr. Yablon that sounded like
6    you were sending him some samples from these containers.  Did
7    that ever happen?
8 A    Yes.
9 Q    We didn't talk about that in the first part of your
10   deposition.  I presume that you would have removed some
11   amount from Exhibit 2 to send to him?
12 A    Yes.
13 Q    Did you remove any amount of the other two containers?
14 A    No.  I just did the -- I think I sent him one of each -- a
15   sample of -- as far as I can recall, I sent him a sample of
16   that one plus also the sealer that I got.
17 Q    Exhibit 3?
18 A    Exhibit 3.
19 Q    So you think you would have sent two separate containers --
20 A    I know I did, yes.
21 Q    -- of liquid?  And what type of containers did you put those
22   samples in?
23 A    In a glass container.
24 Q    Did you go buy those specially somewhere?  Did Trace give you
25   them or something?

Page 66

1 A    I bought them, but I cannot recall where I bought them from.
2 Q    How much volume did you send them, do you remember?
3 A    Half an ounce, maybe.
4 Q    Approximately the same for each?
5 A    Yes.
6 Q    And I saw in the e-mails that there was -- that you were
7    waiting to hear word back.  Did you ever hear back in terms
8    of what -- number one, whether there was any testing done of
9    the two samples that you sent?
10 A   I called him up, and he said he did receive them, and he was
11   going to give me a call back a week later.
12 Q    So you don't know what they did with them then after that?
13 A   I do not.
14 Q    If they tested them, you don't know what the results of that
15   are?
16 A   He never got back with me.
17        MR. STEC:  That's all I have.  Thanks.
18        R E - E X A M I N A T I O N
19 BY MS. FEKARIS:
20 Q    Mr. Jakubowski, you indicated earlier that when you were
21   speaking with Mr. Yablon that there was reference to old
22   materials.  Was that something that Mr. Yablon told you?
23 A   I think so, yes.
24 Q    And the conversations that you had with Mr. Yablon, those
25   were recorded; correct?

Page 67

1 A    Yes.
2 Q    And those are the conversations that your attorney has given
3    to us?
4 A    Yes.
5 Q    I listened to those yesterday, and I don't recall any mention
6    of old materials in those conversations.
7         MR. STEC:  There was a reference to something like,
8    this may have been a year-old product.
9         THE WITNESS:  Yes, exactly.  That's what I'm
10   referring to.
11        MS. FEKARIS:  All right.
12        MS. McLEAN:  Yes.
13 BY MS. FEKARIS:
14 Q    And you have no background in chemistry, correct?
15 A   No.
16 Q    Or toxicology or a medical background, do you?
17 A   No.
18 Q    And your comments regarding the chemicals that your attorney
19   asked you about, those were solely as a layperson and what
20   you may -- what your belief is, correct?
21 A   Yes.
22 Q    After you took the products to Trace Analytic, what happened
23   to the products after with the bottles?  You indicated
24   earlier that you took what was marked as Exhibit 2 and what
25   was marked as Exhibit 3 to Trace Analytic, correct?

19 (Pages 64 to 67)

**Kane & Trap Court Reporting, Inc.**

services@kaneandtrap.com

(616) 742-0700

Page 68

1 A    That's correct.
2 Q    What happened to those bottles after you took them to Trace
3       Analytic?
4 A    I brought them home.
5 Q    And where did you put them after that?
6 A    In my house.
7 Q    Don't recall where, do you?
8 A    The exact location, I'm not sure.
9 Q    You don't know if you kept them in the garage, basement,
10      laundry room?
11 A   It wouldn't be in the garage.  It would probably be in the
12      workshop area, which is in the basement.
13 Q   Your attorney asked you to read several things off the back
14      of this label, and I'm going to ask you just to read one more
15      area here.  Strike that.
16            MS. FEKARIS:  Okay.  That's all I have.
17            MS. McLEAN:  I have a few more based on what you
18      just asked and what Mr. Stec just asked.
19            R E - E X A M I N A T I O N
20 BY MS. McLEAN:
21 Q   When you use a product, Mr. Jakubowski -- for example, if
22      indeed the chemicals that Mr. Stec referred to were low
23      toxicity -- and I don't have what Mr. Stec was looking at
24      when he read that, but I'm assuming that would be that you're
25      using it according to a label; would that be correct?

Page 69

1 A    Yes.
2 Q    So according to the label of Exhibit 2, did Yvonne use the
3       product according to that label?
4 A    Absolutely.
5 Q    And what was in that product and what's represented as to how
6       to use it on the label, are those consistent with each other?
7 A    Yes.
8 Q    But do you know if what's actually in Exhibit 2 is how you
9       should use it according to the label that's on it?
10 A   Could you rephrase that?
11 Q   I almost confused myself with that question.  The chemicals
12      that are actually in the bottle -- do you know if the label
13      that tells how to use it is consistent with the chemicals
14      that are actually in the bottle?
15 A   They're not -- I guess the chemicals that in the bottle are
16      not really consistent from the analysis that I got from it.
17 Q   So you don't really know how a person could safely use what's
18      in the bottle?
19 A   Not really if you compare the actual ingredients.
20 Q   Do you know how the chemicals react together?  Do you have
21      any idea -- you already said you weren't a chemist, but
22      something of low toxicity -- two low toxicity chemicals -- is
23      it possible when you mix them that they could become toxic,
24      common household products?
25 A   I'm not sure.

Page 70

1 Q    For example, like if you mix bleach with something else, you
2       know, if you have any --
3 A    With ammonia or something -- I know there could be fumes that
4       could come off from it.
5 Q    So you don't know if mixing those four products, which may be
6       otherwise not very toxic, could create a toxic situation?
7 A    Possibly.
8 Q    Is it safe to say that you kept the three products that are
9       on the table here -- Exhibit 2, 3 and 4 -- in a safe location
10      in your home?
11 A   Absolutely.
12 Q   Did anyone else have access to those products?
13 A   No.
14 Q   Does anyone else have access to your home?
15 A   No.
16 Q   Is there any reason why someone would have broken into your
17      home and mixed something in those bottles?
18 A   No.
19 Q   Has anybody broken into your home?
20 A   No.
21 Q   Is there anybody that has unfettered access to your home?
22 A   No.
23 Q   So you're the only person that you believe had possession and
24      control over those items?
25 A   Yes.

Page 71

1            MS. McLEAN:  I have nothing further.
2            R E - E X A M I N A T I O N
3 BY MR. STEC:
4 Q    Just one quick question, and hopefully we can put this to
5       bed.
6            Mr. Jakubowski, you've been asked a lot of
7       questions about what it says on this label in terms of what's
8       in the container versus what's on the Trace report.
9       Certainly, the big fancy chemistry words on the Trace report
10      aren't on Exhibit 2, are they?
11 A   That's correct.
12 Q   Do you know whether the common words that are on Exhibit 2
13      are basically the same thing as the big, fancy chemist words
14      on the Trace document?
15 A   I do not know that; I'm not sure.
16 Q   Do you even know what the labeling regulations are that a
17      manufacturer is required to adhere to with respect to when
18      they're supposed to put something on a label and what it's
19      supposed to say?
20 A   I have no idea what the regulations are.
21 Q   Has anyone told you that what Trace identifies as the four
22      ingredients of Exhibit 2 -- that any one or more of those
23      four shouldn't be in Exhibit 2?
24 A   I'm not sure.
25 Q   We do know that Exhibit 3 has two less ingredients than

20 (Pages 68 to 71)

Page 72

1  Exhibit 2. We know that much, right?
2 A  According to the results of the analysis.
3 Q  Now, you don't know whether the recipe for mosaic tile
4  primer -- strike that.
5  You don't know if there's more than one recipe that
6  Mosaic Mercantile might use for their tile primers, do you?
7 A  No.
8 Q  You don't know if some chemist there figured out that we
9  don't need to use four ingredients, we can get by with these
10  two or not, do you?
11 A  I have no idea.
12 Q  For all you know, it was supposed to be that Exhibit 3 was
13  going to have the two ingredients that Trace found and
14  Exhibit 2 was supposed to have the four ingredients that
15  Trace found, right?
16 A  Yes.
17 Q  And no one has told you that anything that was found in
18  Exhibit 2 was defective, did they?
19 A  Other than they just gave me the result.
20 Q  But they never used the word defective in the results. No
21  one said that any of the four ingredients that they
22  identified in Exhibit 2 were bad, did they?
23 A  No, but I went into Trace to say is there a difference
24  between the double label and the single label.
25 Q  Right.

Page 73

1 A  And that was their job, that's what they were supposed to do.
2 Q  And all Trace did was tell you that there's this difference,
3  and we've talked about the difference with those two other
4  chemicals, right?
5 A  Yes.
6 Q  And whether or not that has anything to do with what happened
7  to your wife, you don't know, do you?
8 A  I'm not sure.
9 Q  And no one has told you that it had something to do with what
10  happened to your wife?
11 A  There was possible concerns that there was something.
12 Q  Who looked at that list of four ingredients and compared them
13  to the two ingredients and said, aha, these two extra
14  ingredients might explain what happened to your wife? Who
15  said that?
16 A  It wasn't said that way.
17 Q  You tell me the way that it was said that delivers the same
18  point, if someone said something like that.
19 A  That wasn't said exactly like that other than I was looking
20  for is there a difference between the double label and the
21  single label, where if my wife had to take it off because of
22  that -- and because if she had to take it off -- there was a
23  difference between that one and the single label, and that's
24  the reason she had to try and take it off.
25 Q  You said that's the reason she had to try and take it off.

Page 74

1  What do you mean?
2 A  To remove -- to finish her project because --
3 Q  Who told you that because of those two extra ingredients is
4  why she had to try and remove it from her project?
5 A  What I was trying to do is to find out if -- why did that
6  not -- why did that not dry crystal clear like the sealer
7  claims it was supposed to, because if it did not dry crystal
8  clear -- if it ruined the project so my wife had to try to
9  take it off --
10 Q  Did someone tell you that those two extra ingredients explain
11  why it didn't dry crystal clear?
12 A  No.
13 Q  So are you just assuming that?
14 A  I believe so.
15  MR. STEC: All right. Thanks.
16  MS. FEKARIS: Sir, I just have a couple follow-ups.
17  R E - E X A M I N A T I O N
18 BY MS. FEKARIS:
19 Q  Do you have any knowledge that mixing product in number
20  two -- or what type of reaction mixing number -- the product
21  in Exhibit Number 2 with mineral spirits would be?
22 A  Could you ask that again?
23 Q  Do you have any knowledge regarding what the reaction between
24  what is in Exhibit Number 2 and mixing that with mineral
25  spirits -- what that would be?

Page 75

1 A  I do not know that.
2 Q  On Exhibit Number 2, looking at the label, does it say -- can
3  you read here where it says -- it begins with do not mix.
4  Just read that sentence.
5 A  It says: Do not mix Mosaic Grout Sealer with any other
6  chemical.
7 Q  Okay. You indicated that you stopped working in 2006. Have
8  you worked at all since then?
9 A  No, I'm retired.
10 Q  You haven't worked outside the family home for any reason
11  since 2006?
12 A  I've been maintaining my mother and stuff, but she passed
13  away, and it worked out good with me being retired.
14  MS. FEKARIS: That's all I have.
15  MS. McLEAN: I have a little follow-up now.
16  R E - E X A M I N A T I O N
17 BY MS. McLEAN:
18 Q  Did your wife mix these chemicals together?
19 A  No, she did not.
20 Q  So did she mix two liquids together?
21 A  No.
22 Q  Why is that?
23 A  She was just trying to remove the product from her project
24  that she was working on, and the only -- it wasn't coming off
25  with water, and it was -- the only way she had to do it was

**Kane & Trap Court Reporting, Inc.**

services@kaneandtrap.com                    (616) 742-0700

Page 76

1    to use something to cut the mosaic sealer off the tile, to
2    try to cut that material or try to remove it.
3 Q   So in your mind when it says mix -- do not mix, would that be
4    like if you poured these two products into the same bowl or
5    same container?
6 A   That would be my understanding, yes.
7        MS. McLEAN:  I have nothing further.
8        MR. STEC:  We're done.
9        (Deposition concluded at 3:35 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 77

1               CERTIFICATE
2    STATE OF MICHIGAN )
3               ) SS
4    COUNTY OF OTTAWA  )
5        I, Kathryn Trap Hevelhurst, Notary Public in and
6    for the County of Ottawa, State of Michigan, do hereby
7    certify that the foregoing deposition was taken before me at
8    the time and place hereinbefore set forth and that said
9    witness was duly sworn by me to tell the truth, the whole
10    truth, and nothing but the truth, and thereupon was examined
11    and testified in the foregoing deposition.
12        I further certify that this deposition was taken
13    in shorthand by me, transcribed with the aid of a computer,
14    in compliance with the regulations set forth in the Court
15    Reporter Manual published by the Michigan State Court
16    Administrator's Office, and that it is a true and correct
17    transcript.
18        IN WITNESS WHEREOF, I have hereunto set my hand
19    this 30th day of January, 2011.
20
21    _____
22    Kathryn Trap Hevelhurst, Notary Public
23    in and for the County of Ottawa
24    State of Michigan.
25    Commission expires:  4/23/2015

22 (Pages 76 to 77)

**Kane & Trap Court Reporting, Inc.**

services@kaneandtrap.com                      (616) 742-0700

# EXHIBIT 6

02/22/1999 14:49 5108958800 TRIANGLE COATINGS PAGE 01

1739

# M A T E R I A L   S A F E T Y   D A T A   S H E E T

9716238

## SECTION 1 - CHEMICAL PRODUCT AND COMPANY IDENTIFICATION

PRODUCT NAME        : Primer
IDENTIFICATION NUMBER: AM250
PRODUCT USE/CLASS    : Primer                    DATE PRINTED: 02/22/99

SUPPLIER:
Mosaic Mercantile
~~2323 Third Street #339~~  461 2nd St
~~Suite 339~~
San Francisco, CA 94107

MANUFACTURER:
Triangle Coatings, Inc.
1930 Fairway Drive
San Leandro, CA 94577-5681

TELEPHONE:415-252-5580
9am-5pm PST Monday-Friday

EMERGENCY TELEPHONE:800-895-8000
(7:00 am - 5:00 pm PST)

PREPARER: , PHONE: , PREPARE DATE: 07/23/98

## SECTION 2 - COMPOSITION/INFORMATION ON INGREDIENTS

| ITEM | CHEMICAL NAME | CAS NUMBER | WT/WT % EQUAL TO |
|------|---------------|------------|------------------|

No Hazardous Materials are Contained in this Product

(See Section 16 for abbreviation legend)

## SECTION 3 - HAZARDS IDENTIFICATION

*** EMERGENCY OVERVIEW ***:  Harmful if swallowed.  Causes eye irritation.

EFFECTS OF OVEREXPOSURE - EYE CONTACT:  May cause irritation including pain, tearing or reddening accompanied by stinging sensation.

EFFECTS OF OVEREXPOSURE - SKIN CONTACT:  May cause skin irritation.

EFFECTS OF OVEREXPOSURE - INHALATION:  No hazard in normal industrial use.

EFFECTS OF OVEREXPOSURE - INGESTION:  This material may be harmful or fatal if swallowed.

EFFECTS OF OVEREXPOSURE - CHRONIC HAZARDS:  None.

PRIMARY ROUTE(S) OF ENTRY:  Unknown

(Continued on Page 2)

02/22/1999  14:43  5.08956800                 TRIANGLE COATINGS                    PAGE 02

Product: AM250              Preparation Date: 07/29/78                    Page 2

========================================================================
                    SECTION 4 - FIRST AID MEASURES
========================================================================

FIRST AID - EYE CONTACT:  Immediately flush eyes with plenty of water for
15 minutes. Get medical attention, if irritation persists.

FIRST AID - SKIN CONTACT:  Wash with soap and water. Get medical attention
if irritation develops or persists. Remove contaminated clothing and
shoes. Do not reuse until cleaned.

FIRST AID - INHALATION:  Remove to fresh air.  If not breathing, give
artificial respiration.  If breathing is difficult, give oxygen.  Get
immediate medical attention.

FIRST AID - INGESTION:  If swallowed, do NOT induce vomiting.  Give victim
a glass of water or milk.  Call a physician or poison control center
immediately.  Never give anything by mouth to an unconscious person.

========================================================================
                  SECTION 5 - FIRE FIGHTING MEASURES
========================================================================

FLASH POINT: N.A.

                                        LOWER EXPLOSIVE LIMIT: N.A.
                                        UPPER EXPLOSIVE LIMIT: N.A.

AUTOIGNITION TEMPERATURE: N.D.

EXTINGUISHING MEDIA:  Unknown

UNUSUAL FIRE AND EXPLOSION HAZARDS:  Product will not burn but may spatter
if temperature exceeds boiling point.

SPECIAL FIREFIGHTING PROCEDURES:  Containers can build up pressure if
exposed to heat (fire).  As in any fire, wear self-contained breathing
apparatus pressure-demand (MSHA/NIOSH approved or equivalent) and full
protective gear.  Water runoff can cause environmental damage.  Dike and
collect water used to fight fire.

========================================================================
                 SECTION 6 - ACCIDENTAL RELEASE MEASURES
========================================================================

STEPS TO BE TAKEN IN CASE MATERIAL IS RELEASED OR SPILLED:  Ventilate area.
Absorb spill with suitable absorbent material, then place in a chemical
waste container.  Avoid runoff into storm sewers and ditches which lead to
waterways.  If large spill, dike area and call spill response team. Notify
appropriate state and local agencies.

========================================================================
                  SECTION 7 - HANDLING AND STORAGE
========================================================================

HANDLING:  Wash thoroughly after handling.

STORAGE:  Keep from freezing.  Keep container closed when not in use.

                                        (Continued on Page 3)

Product: AM250                    Preparation Date: 07/22/96          Page 3

```
┌══════════════════════════════════════════════════════════════════┐
│           SECTION 8 - EXPOSURE CONTROLS/PERSONAL PROTECTION         │
└══════════════════════════════════════════════════════════════════┘
```

ENGINEERING CONTROLS: Good general ventilation should be sufficient to control airborne levels.

RESPIRATORY PROTECTION: Atmospheric levels should be maintained below the exposure limits listed in Section 2 by using engineering controls. If not feasible, use a NIOSH approved respirator.

SKIN PROTECTION: General use of chemical resistant gloves are recommended to protect the skin from drying and irritation. Lotions and barrier creams are also recommended to prevent drying of the skin.

EYE PROTECTION: Eye protection is recommended.

OTHER PROTECTIVE EQUIPMENT: If repeated or prolonged skin contact or contamination is likely, protective clothing should be worn.

HYGIENIC PRACTICES: Establish good personal hygiene and work practices. Always wash hands before eating, drinking, or smoking.

```
┌══════════════════════════════════════════════════════════════════┐
│              SECTION 9 - PHYSICAL AND CHEMICAL PROPERTIES            │
└══════════════════════════════════════════════════════════════════┘
```

| | | | |
|---|---|---|---|
| BOILING RANGE | : N.A. | VAPOR DENSITY | : Is lighter than air |
| ODOR | : Mild | ODOR THRESHOLD | : N.E. |
| APPEARANCE | : White | EVAPORATION RATE | : Is slower than Butyl |
| SOLUBILITY IN H2O | : Dilutable | | Acetate |
| FREEZE POINT | : 32 | SPECIFIC GRAVITY | : 1.3879 |
| VAPOR PRESSURE | : N.E. | pH @ 100.0 % | : 9.0 |
| PHYSICAL STATE | : Liquid | VISCOSITY | : 85-95 KU |
| VOLATILE BY VOLUME | : 63.4% | | |

COEFFICIENT OF WATER/OIL DISTRIBUTION: N.E.

(See Section 16 for abbreviation legend)

```
┌══════════════════════════════════════════════════════════════════┐
│                  SECTION 10 - STABILITY AND REACTIVITY              │
└══════════════════════════════════════════════════════════════════┘
```

CONDITIONS TO AVOID: No Information.

INCOMPATIBILITY: Avoid contact with strong oxidizing agents.

HAZARDOUS DECOMPOSITION PRODUCTS: Can include carbon dioxide and carbon monoxide.

HAZARDOUS POLYMERIZATION: Will not occur under normal conditions.

STABILITY: This product is stable under normal storage conditions.

(Continued on Page 4)

Products: AM250      Preparation Date: 07/23/98      Page 4

```
[=========================================================]
]            SECTION 11 - TOXICOLOGICAL PROPERTIES        ]
[=========================================================]
```

No product or component toxicological information is available.

TOXICOLOGICAL INFORMATION: This information shown in Section 3 is based on the toxicity profiles for a number of products that are compositionally similar to this product.

```
[=========================================================]
]            SECTION 12 - ECOLOGICAL INFORMATION          ]
]=========================================================]
```

ECOLOGICAL INFORMATION: Refer to local, county, state and federal storm water and air quality regulations.

```
[=========================================================]
]            SECTION 13 - DISPOSAL CONSIDERATIONS         ]
]=========================================================]
```

DISPOSAL METHOD: Dispose of in accordance with local, county, state, and federal regulations. Incineration is preferred.

```
[=========================================================]
]            SECTION 14 - TRANSPORTATION INFORMATION      ]
]=========================================================]
```

No transportation information is available.

```
[=========================================================]
]            SECTION 15 - REGULATORY INFORMATION          ]
]=========================================================]
```

THE FOLLOWING COMPONENTS ARE NOT SUBJECT TO REPORTING IN SECTION 2:

| ---------- CHEMICAL NAME ---------- | CAS NUMBER | WT/WT % |
|---|---|---|
| Water | 7732185 | 41.1 % |
| Aqueous Acrylic Emulsion | | 13.5 % |
| TITANIUM DIOXIDE | 13463-67-7 | 11.3 % |
| CALCIUM CARBONATE | 1317-65-3 | 9.6 % |
| MAGNESIN SILICATE | 14807-96-6 | 8.0 % |
| SILICEOUS MUSCOVITE MICA | 12001-26-2 | 4.0 % |
| MOD CALCIUM BARIUM PHOSPHO SILICATE | 66408-68-4 | 4.0 % |
| 1,2-Propanediol | 57556 | 2.9 % |
| CALCIUM STRONTIUM PHOSPHO SILICATE | | 2.0 % |
| 2,2,4-Trimethyl-1,3-Pentanediol Monoi | 25265774 | 0.7 % |
| Hydroxyethyl Cellulose, HEC | 9004620 | 0.5 % |
| ALUMINUM OXIDE DUST | 1344281 | 0.4 % |
| Aromatic Hydrocarbon Mixture | 64742945 | 0.3 % |
| Naphthalene | 91203 | 0.2 % |
| Defoamer | Trade Secret | 0.2 % |
| Sodium Salt of Polycarboxylic Acid | Not Hazardous | 0.2 % |
| Ammonium Benzoate | 1863634 | 0.2 % |
| ALKYL ARYL POLYETHER | 60964-33-1 | 0.2 % |
| PHOSPHATE ESTER | | 0.1 % |
| No Chemical Name Given | Proprietary | 0.1 % |
| DI Water | 7732185 | 0.1 % |

(Continued on Page 5)

02/22/1999 14:49    5108958800         TRIANGLE COATINGS          PAGE  06

Product: AM250         Preparation Date: 07/23/98          Page 5

|==================================================================|
|                 SECTION 15 - REGULATORY INFORMATION              |
|==================================================================|

| ------------ CHEMICAL NAME ------------ | CAS NUMBER | WT/WT % |
|-----------------------------------------|------------|---------|
| 2(hydroxymethylamino) ethanol           | 34375285   | 0.1 %   |
| Amorphous Hydrated Silica               | 7631869    | 0.1 %   |
| Ammonia                                 | 7664417    | 0.1 %   |
| Ammonium Hydroxide                      | 1336216    | 0.1 %   |
| Isopropyl Alcohol                       | 67630      | 0.1 %   |
| 1,2,4-Trimethylbenzene                  | 95636      | 0.01 %  |

U.S. FEDERAL REGULATIONS: AS FOLLOWS -

OSHA: Non-hazardous by definition of Hazard Communication Standard (29 CFR 1910.1200)

SARA SECTION 313:
This product contains the following substances subject to the reporting requirements of Section 313 of Title III of the Superfund Amendments and Reauthorization Act of 1986 and 40 CFR Part 372:

| ------------ CHEMICAL NAME ------------ | CAS NUMBER | WT/WT % |
|-----------------------------------------|------------|---------|
| Naphthalene                             | 91203      | 0.2 %   |
| Ammonia                                 | 7664417    | 0.1 %   |
| Ammonium Hydroxide                      | 1336216    | 0.1 %   |
| 1,2,4-Trimethylbenzene                  | 95636      | 0.01 %  |

U.S. STATE REGULATIONS: AS FOLLOWS -

PENNSYLVANIA RIGHT-TO-KNOW:
The following non-hazardous ingredients are present in the product at greater than 3%:

| ------------ CHEMICAL NAME ------------ | CAS NUMBER  |
|-----------------------------------------|-------------|
| Water                                   | 7732185     |
| Aqueous Acrylic Emulsion                |             |
| TITANIUM DIOXIDE                        | 13463-67-7  |
| CALCIUM CARBONATE                       | 1317-65-3   |
| MAGNESIN SILICATE                       | 14807-96-6  |
| SILICEOUS MUSCOVITE MICA                | 12001-26-2  |
| MOD CALCIUM BARIUM PHOSPHO SILICATE     | 66402-68-4  |

CALIFORNIA PROPOSITION 65:
None known.

INTERNATIONAL REGULATIONS: AS FOLLOWS -

CANADIAN WHMIS: This MSDS has been prepared in compliance with Controlled Product Regulations except for use of the 16 headings.

CANADIAN WHMIS CLASS: No information available.

(Continued on Page 6)

02/22/1999 14:49    5108956800             TRIANGLE COATINGS           PAGE 06

  Product: AM250                  Preparation Date: 07/23/98          Page 6
================================================================================
                         SECTION 16 - OTHER INFORMATION
================================================================================

HMIS RATINGS - HEALTH: 1      FLAMMABILITY: 0      REACTIVITY: 0

PREVIOUS MSDS REVISION DATE: 04/11/97

.VOLATILE ORGANIC COMPOUNDS (VOCS): 1.20 lbs/gal,    143 grams/ltr

LEGEND:   N.A. - Not Applicable, N.E. - Not Established,
          N.D. - Not Determined

================================================================================

The information contained on this MSDS has been checked and should be
accurate.  However, it is the responsibility of the user to comply with all
Federal, State, and Local laws and regulations.
================================================================================
<END OF MSDS>

Vendor 060729
1-5-00

# EXHIBIT 7



**TRACE**

*the science of compliance*

phone    231·773·5998
toll-free   800·733·5998
fax      231·773·6537

Trace Analytical Laboratories, Inc.
2241 Black Creek Road
Muskegon, MI 49444·2673
info@trace-labs.com
www.trace-labs.com

July 16, 2008

Mr. Dennis Jakubowski
2718 Durham NE
Grand Rapids, MI 49505

RE: Trace ID T08G130

Dear Mr. Jakubowski:

Two samples were submitted by you on July 11, 2008 and designated as Double Label and Single Label. Both samples are water based liquids with milky emulsions present. There are physical differences between the two products. Sample, Double Label, is more viscous than Sample, Single Label, and has a slight solvent odor. Double Label is cream colored while Single Label is white.

Your samples were, subsequently, analyzed by EPA Method 8270 using GC/MS instrumentation. The analysis for Double Label showed four compounds present, while the analysis for Single Label showed two compounds present, both of which were present in Double Label. The extra two compounds found in Double Label are consistent with chemicals found in grout sealers.

In conclusion, the two samples submitted are both grout sealers but are physically and chemically different from each other.

Thank you for working with Trace. If you have questions regarding this data, please call me at (231) 773-5998, ext. 224.

Sincerely,

Gina M. Roe
Project Manager

RVB/bmc



EXHIBIT
5
1/20/12 KH

TRACE IS VALIDATED BY THE U.S. ARMY CORPS OF ENGINEERS

# CHAIN-OF-CUSTODY RECORD

TRACE ID NO. **70861130**

**TRACE**
the science of compliance

phone 231-773-5998
toll-free 800-733-5998
fax 231-773-6537

**Trace Analytical Laboratories, Inc.**
2241 Black Creek Road
Muskegon, MI 49444-2673
www.trace-labs.com

**Report Results To:**

Client Name: DENNIS JAKUBOWSKI
Contact Person: SAME
Mailing Address: 2718 DURHAM N.E.
City, State, Zip Code: GRAND Rapids, Mi 49505
Phone: 616-363-5292  Fax:
Email Address: DENNISJAKUSKI @ YMAC.com
Project #:   PO #:   Trace Quote #:
Project Name:   Sampled by:

**Bill To:**

Billing Address (if different): 2718 DURHAM N.E.
City, State, Zip Code: GRAND Rapids, Mi 49505
Attn:
Phone: 616-363-5292  Fax:

Logged By: [signature]   07/04/08   Page ___ of ___   Checked By: [signature]

Received on Ice: Yes  No   Preservative Checked: Yes  No  N/A
Soil Volatiles Preserved: MeOH  En Core  Low Level  Lab

Total Due is $150.00

**Regulatory Requirements**
MERA TMDLs ☐
Drinking Water ☐
NPDES ☐
USACE ☐
Special ☐

**Turnaround Requirements**
Standard (2 wk) ☐
• 5 Day ☐
• 2-4 Day (RUSH) ☐
• 24 Hour (RUSH) ☐
• Requires prior approval

**Matrix Key**
S = Soil
W = Water
O = Oil
SO = Solid Waste
SE = Sediment
A = Air
D = Drinking Water
SL = Sludge
WI = Wipes
LW = Liquid Waste

**Request for Analytical Services**

| TRACE NO. | DATE TAKEN | TIME TAKEN | METALS FIELD FILTERED | CLIENT SAMPLE ID | DATE | TIME | MATRIX | NUMBER OF CONTAINERS | ANALYSIS REQUESTED | | REMARKS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 01 | 7/1/08 | | | Double Lobell | 7/1/08 | 14:07 | W | 1 | X | | |
| 02 | 7/1/08 | | | Single Icebell | | | W | 1 | X | | |
| | | | | | | | | | | | |

ANALYSIS REQUESTED: Arsenic Emerging

**Please Sign**

| Item # | RELEASED BY | DATE | TIME | RECEIVED BY | RELEASED BY | RECEIVED BY | DATE | TIME |
|---|---|---|---|---|---|---|---|---|
| 1) | Dennis Jakubowski | 7/1/08 | | [signature] | | | | |
| 2) | | | | | | | | |
| 3) | | | | | | | | |
| 4) | | | | | | | | |

Possible Health Hazard

In executing this agreement, the client acknowledges acceptance of the terms of the agreement as listed on the reverse side.

TRACE USE ONLY

# CHAIN-OF-CUSTODY RECORD

## TRACE
the science of compliance

**Trace Analytical Laboratories, Inc.**
2241 Black Creek Road
Muskegon, MI 49444-2673
www.trace-labs.com

phone 231-773-5998
toll-free 800-733-5998
fax 231-773-6537

TRACE ID NO. 10816130

**Report Results To:**

Client Name: DENNIS TAKUBOWSKI

Contact Person: SAME

Mailing Address: 2718 DURHAM N.E.

City, State, Zip Code: GRAND Rapids, MI 49505

Phone: 616-363-5292   Fax:

Email Address: DENNISTAKSKI@TMAC.COM

Project #:   PO #:

Project Name:

**Bill To:**

Billing Address (if different): 2718 DURHAM N.E.

City, State, Zip Code: GRAND Rapids, MI 49505

Attn:

Phone: 616-363-5292  Fax:

Trace Quote #:

Sampled by:

Logged By:

Page ___ of ___

Checked By:

Received on Ice: Yes / No

Soil Volatiles Preserved: MeOH  En Core  Low Level  Lab

Preservative Checked: Yes  No  N/A

Total Due is $150.00

**Regulatory Requirements**
- MERA TMDLs
- Drinking Water
- NPDES
- USACE
- Special

**Turnaround Requirements**
- Standard (2 wk)
- 5 Day
- 2-4 Day (RUSH)
- 24 Hour (RUSH)
- Requires prior approval

**Matrix Key**
S = Soil
W = Water
SE = Sediment
O = Oil
SO = Solid Waste
WI = Wipes
LW = Liquid Waste
A = Air
D = Drinking Water
SL = Sludge

ANALYSIS REQUESTED

**Request for Analytical Services**

| TRACE NO. | DATE TAKEN | TIME TAKEN | METALS FIELD FILTERED | CLIENT SAMPLE ID | DATE | TIME | MATRIX | NUMBER OF CONTAINERS | | | | REMARKS | Possible Health Hazard |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01 | | | | Dockie Catch | 7/4/08 | 14:07 | S | 1 | X | | | MERA Inorganics | |
| 02 | | | | Ditch intake | | | S | 1 | Y | | | | |

**Please Sign**

| Item # | RELEASED BY | RECEIVED BY | | RELEASED BY | RECEIVED BY | DATE | TIME |
|---|---|---|---|---|---|---|---|
| 1) | Dennis Takubowski | | | | | | |
| 2) | | | | | | | |
| 3) | | | | | | | |
| 4) | | | | | | | |

In executing this agreement, the client acknowledges acceptance of the terms of the agreement as listed on the reverse side.

**From:** Gina Roe <groe@trace-labs.com>
**Subject:** Trace ID T08G130
**Date:** July 22, 2008 4:58:59 PM GMT-04:00
**To:** dennisjakski@mac.com
📎 2 Attachments, 10.8 KB ( Save ▾ ) ( Slideshow )

Gina,

Enclosed is your report.

If you have questions regarding this data, please contact me.

# Gina

Gina M. Roe
Project Manager
Trace Analytical Labs
(231) 773-5998 x224
groe@trace-labs.com

| | | |
|---|---|---|
| *phone* | 231-773-5998 | *Trace Analytical Laboratories, Inc.* |
| *toll-free* | 800-773-5998 | 2140 Black Creek Road |
| *fax* | 231-773-6557 | Muskegon, MI 49444-2673 |
| | | info@trace-labs.com |
| | | www.trace-labs.com |



TRACE
*the science of compliance*

July 22, 2008

Mr. Dennis Jakubowski
2718 Durham NE
Grand Rapids, MI 49505

RE: Trace ID T08G130

The following compounds were identified from the samples that you submitted on July 11, 2008:

Sample ID: Double Label

2-(2-butoxyethoxy)-Ethanol
2-methyl, 2-methylpropyl ester Propanioc Acid
Butyl ester Butanoic Acid
Di-n-butyl phthalate

Sample ID: Single Label

2-methyl, 2-methylpropyl ester Propanioc Acid
Butyl ester Butanoic Acid

Thank you for working with Trace. If you have any questions please contact me at 231-

773-5998 x224.

Sincerely,

Gina M. Roe
Project Manager

02/22/1999 14:49 5188958888 TRIANGLE COATINGS PAGE 01

1739.

# MATERIAL SAFETY DATA SHEET

9716238

## SECTION 1 - CHEMICAL PRODUCT AND COMPANY IDENTIFICATION

PRODUCT NAME : Primer
IDENTIFICATION NUMBER: AM250
PRODUCT USE/CLASS : Primer

DATE PRINTED: 02/22/99

SUPPLIER:
Mosaic Mercantile
~~2325 Third Street #391~~ 461 2nd St
~~Suite 329~~
San Francisco, CA 94107

MANUFACTURER:
Triangle Coatings, Inc.
1930 Fairway Drive
San Leandro, CA 94577-5681

TELEPHONE:415-252-5580
9am-5pm PST Monday-Friday

EMERGENCY TELEPHONE:800-895-8000
(7:00 am - 5:00 pm PST)

PREPARER: , PHONE: , PREPARE DATE: 07/23/98

## SECTION 2 - COMPOSITION/INFORMATION ON INGREDIENTS

| ITEM | CHEMICAL NAME | CAS NUMBER | WT/WT % EQUAL TO |
|------|---------------|------------|------------------|

No Hazardous Materials are Contained in this Product

(See Section 16 for abbreviation legend)

## SECTION 3 - HAZARDS IDENTIFICATION

\*\*\* EMERGENCY OVERVIEW \*\*\*: Harmful if swallowed. Causes eye irritation.

EFFECTS OF OVEREXPOSURE - EYE CONTACT: May cause irritation including pain, tearing or reddening accompanied by stinging sensation.

EFFECTS OF OVEREXPOSURE - SKIN CONTACT: May cause skin irritation.

EFFECTS OF OVEREXPOSURE - INHALATION: No hazard in normal industrial use.

EFFECTS OF OVEREXPOSURE - INGESTION: This material may be harmful or fatal if swallowed.

EFFECTS OF OVEREXPOSURE - CHRONIC HAZARDS: None.

PRIMARY ROUTE(S) OF ENTRY: Unknown

(Continued on Page 2)

Product: AM250                Preparation Date: 07/23/78       Page 2

## SECTION 4 - FIRST AID MEASURES

FIRST AID - EYE CONTACT: Immediately flush eyes with plenty of water for 15 minutes. Get medical attention, if irritation persists.

FIRST AID - SKIN CONTACT: Wash with soap and water. Get medical attention if irritation develops or persists. Remove contaminated clothing and shoes. Do not reuse until cleaned.

FIRST AID - INHALATION: Remove to fresh air. If not breathing, give artificial respiration. If breathing is difficult, give oxygen. Get immediate medical attention.

FIRST AID - INGESTION: If swallowed, do NOT induce vomiting. Give victim a glass of water or milk. Call a physician or poison control center immediately. Never give anything by mouth to an unconscious person.

## SECTION 5 - FIRE FIGHTING MEASURES

FLASH POINT: N.A.                    LOWER EXPLOSIVE LIMIT: N.A.
                                     UPPER EXPLOSIVE LIMIT: N.A.

AUTOIGNITION TEMPERATURE: N.D.

EXTINGUISHING MEDIA: Unknown

UNUSUAL FIRE AND EXPLOSION HAZARDS: Product will not burn but may spatter if temperature exceeds boiling point.

SPECIAL FIREFIGHTING PROCEDURES: Containers can build up pressure if exposed to heat (fire). As in any fire, wear self-contained breathing apparatus pressure-demand (MSHA/NIOSH approved or equivalent) and full protective gear. Water runoff can cause environmental damage. Dike and collect water used to fight fire.

## SECTION 6 - ACCIDENTAL RELEASE MEASURES

STEPS TO BE TAKEN IN CASE MATERIAL IS RELEASED OR SPILLED: Ventilate area. Absorb spill with suitable absorbent material, then place in a chemical waste container. Avoid runoff into storm sewers and ditches which lead to waterways. If large spill, dike area and call spill response team. Notify appropriate state and local agencies.

## SECTION 7 - HANDLING AND STORAGE

HANDLING: Wash thoroughly after handling.

STORAGE: Keep from freezing. Keep container closed when not in use.

(Continued on Page 3)

Product: AM250                Preparation Date: 07/22/98            Page 3

```
==========================================================================
|              SECTION 8 - EXPOSURE CONTROLS/PERSONAL PROTECTION           |
==========================================================================
```

ENGINEERING CONTROLS: Good general ventilation should be sufficient to control airborne levels.

RESPIRATORY PROTECTION: Atmospheric levels should be maintained below the exposure limits listed in Section 2 by using engineering controls. If not feasible, use a NIOSH approved respirator.

SKIN PROTECTION: General use of chemical resistant gloves are recommended to protect the skin from drying and irritation. Lotions and barrier creams are also recommended to prevent drying of the skin.

EYE PROTECTION: Eye protection is recommended.

OTHER PROTECTIVE EQUIPMENT: If repeated or prolonged skin contact or contamination is likely, protective clothing should be worn.

HYGIENIC PRACTICES: Establish good personal hygiene and work practices. Always wash hands before eating, drinking, or smoking.

```
==========================================================================
|               SECTION 9 - PHYSICAL AND CHEMICAL PROPERTIES              |
==========================================================================
```

BOILING RANGE       : N.A.          VAPOR DENSITY     : Is lighter than air
ODOR                : Mild          ODOR THRESHOLD    : N.E.
APPEARANCE          : White         EVAPORATION RATE: Is slower than Butyl
SOLUBILITY IN H2O   : Dilutable                       Acetate
FREEZE POINT        : 32            SPECIFIC GRAVITY: 1.2879
VAPOR PRESSURE      : N.E.          pH @ 100.0 %      : 9.0
PHYSICAL STATE      : Liquid        VISCOSITY         : 85-95 KU
VOLATILE BY VOLUME: 63.4%
COEFFICIENT OF WATER/OIL DISTRIBUTION: N.E.

(See Section 16 for abbreviation legend)

```
==========================================================================
|                   SECTION 10 - STABILITY AND REACTIVITY                 |
==========================================================================
```

CONDITIONS TO AVOID: No Information.

INCOMPATIBILITY: Avoid contact with strong oxidizing agents.

HAZARDOUS DECOMPOSITION PRODUCTS: Can include carbon dioxide and carbon monoxide.

HAZARDOUS POLYMERIZATION: Will not occur under normal conditions.

STABILITY: This product is stable under normal storage conditions.

(Continued on Page 4)

02/22/1999 16:49 5108958900       TRIANGLE COATINGS       PAGE 84

Product: AM250      Preparation Date: 07/23/98      Page 4

```
==============================================================
          SECTION 11 - TOXICOLOGICAL PROPERTIES
==============================================================
```

No product or component toxicological information is available.

TOXICOLOGICAL INFORMATION: This information shown in Section 3 is based on the toxicity profiles for a number of products that are compositionally similar to this product.

```
==============================================================
          SECTION 12 - ECOLOGICAL INFORMATION
==============================================================
```

ECOLOGICAL INFORMATION: Refer to local, county, state and federal storm water and air quality regulations.

```
==============================================================
          SECTION 13 - DISPOSAL CONSIDERATIONS
==============================================================
```

DISPOSAL METHOD: Dispose of in accordance with local, county, state, and federal regulations. Incineration is preferred.

```
==============================================================
          SECTION 14 - TRANSPORTATION INFORMATION
==============================================================
```

No transportation information is available.

```
==============================================================
          SECTION 15 - REGULATORY INFORMATION
==============================================================
```

THE FOLLOWING COMPONENTS ARE NOT SUBJECT TO REPORTING IN SECTION 2:

| CHEMICAL NAME | CAS NUMBER | WT/WT % |
|---|---|---|
| Water | 7732185 | 41.1 % |
| Aqueous Acrylic Emulsion | | 13.5 % |
| TITANIUM DIOXIDE | 13463-67-7 | 11.3 % |
| CALCIUM CARBONATE | 1317-65-3 | 9.6 % |
| MAGNESIN SILICATE | 14807-96-6 | 8.0 % |
| SILICEOUS MUSCOVITE MICA | 12001-26-2 | 4.0 % |
| MOD CALCIUM BARIUM PHOSPHO SILICATE | 66408-62-4 | 4.0 % |
| 1,2-Propanediol | 57556 | 2.9 % |
| CALCIUM STRONTIUM PHOSPHO SILICATE | | 2.0 % |
| 2,2,4-Trimethyl-1,3-Pentanediol Monoi | 25265774 | 0.7 % |
| Hydroxyethyl Cellulose, HEC | 9004620 | 0.5 % |
| ALUMINUM OXIDE DUST | 1344281 | 0.4 % |
| Aromatic Hydrocarbon Mixture | 64742945 | 0.3 % |
| Naphthalene | 91203 | 0.2 % |
| Defoamer | Trade Secret | 0.2 % |
| Sodium Salt of Polycarboxylic Acid | Not Hazardous | 0.2 % |
| Ammonium Benzoate | 1863634 | 0.2 % |
| ALKYL ARYL POLYETHER | 60864-33-1 | 0.2 % |
| PHOSPHATE ESTER | | 0.1 % |
| No Chemical Name Given | Proprietary | 0.1 % |
| DI Water | 7732185 | 0.1 % |

(Continued on Page 5)

02/22/1999 14:49  6108968800                TRIANGLE COATINGS            PAGE 06
    Product: AM250                  Preparation Date: 07/23/98          Page 5
|===============================================================================|
|                     SECTION 15 - REGULATORY INFORMATION                       |
|===============================================================================|

----------- CHEMICAL NAME -----------      CAS NUMBER            WT/WT %
2-((hydroxymethyl)amino) ethanol           34375285               0.1 %
Amorphous Hydrated Silica                  7631869                0.1 %
Ammonia                                    7664417                0.1 %
Ammonium Hydroxide                         1336216                0.1 %
Isopropyl Alcohol                          67630                  0.1 %
1,2,4-Trimethylbenzene                     95636                  0.01 %

U.S. FEDERAL REGULATIONS: AS FOLLOWS -

OSHA: Non-hazardous by definition of Hazard Communication Standard (29 CFR
1910.1200).

SARA SECTION 313:
This product contains the following substances subject to the reporting
requirements of Section 313 of Title III of the Superfund Amendments and
Reauthorization Act of 1986 and 40 CFR Part 372:

----------- CHEMICAL NAME -----------      CAS NUMBER            WT/WT %
Naphthalene                                91205                  0.2 %
Ammonia                                    7664417                0.1 %
Ammonium Hydroxide                         1336216                0.1 %
1,2,4-Trimethylbenzene                     95636                  0.01 %

U.S. STATE REGULATIONS: AS FOLLOWS -

PENNSYLVANIA RIGHT-TO-KNOW:
The following non-hazardous ingredients are present in the product at
greater than 3%:

----------- CHEMICAL NAME -----------      CAS NUMBER
Water                                      7732185
Aqueous Acrylic Emulsion
TITANIUM DIOXIDE                           13463-67-7
CALCIUM CARBONATE                          1317-65-3
MAGNESIN SILICATE                          14807-96-6
SILICEOUS MUSCOVITE MICA                   12001-26-2
MOD CALCIUM BARIUM PHOSPHO SILICATE        66402-68-4

CALIFORNIA PROPOSITION 65:
None Known.

INTERNATIONAL REGULATIONS: AS FOLLOWS -

CANADIAN WHMIS: This MSDS has been prepared in compliance with Controlled
Product Regulations except for use of the 16 headings.

CANADIAN WHMIS CLASS: No information available.

(Continued on Page 6)

02/22/1999 14:49    5108956000          TRIANGLE COATINGS          PAGE 06

Product: AM250          Preparation Date: 07/23/98          Page 6

===========================================================================

SECTION 16 — OTHER INFORMATION

===========================================================================

HMIS RATINGS — HEALTH: 1     FLAMMABILITY: 0     REACTIVITY: 0

PREVIOUS MSDS REVISION DATE: 04/11/97

VOLATILE ORGANIC COMPOUNDS (VOCS): 1.20 lbs/gal,    143 grams/ltr

LEGEND:    N.A. — Not Applicable, N.E. — Not Established,
           N.D. — Not Determined

===========================================================================

The information contained on this MSDS has been checked and should be
accurate. However, it is the responsibility of the user to comply with all
Federal, State, and Local laws and regulations.
===========================================================================
<END OF MSDS>

*Vendor 060729*
*1-5-00*